2006 UT 73

**UTAH CHAPTER OF the SIERRA CLUB, a non-profit organization, and Grand Canyon Trust, a non-profit organization, Petitioners,**

v.

**UTAH AIR QUALITY BOARD, an agency of the State of Utah, and Intermountain Power Service Corporation, Respondents.**

No. 20050454.

Supreme Court of Utah.

Nov. 21, 2006.

Joro Walker, Sean Phelan, Salt Lake City, for petitioners.

Mark L. Shurtleff, Att'y Gen., Fred G. Nelson, Paul McConkie, Asst. Att'ys Gen., Salt Lake City, George M. Haley, E. Blaine Rawson, Salt Lake City, for respondents.

On Certification from the Utah
Court of Appeals

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 The Executive Secretary of the Utah Division of Air Quality granted a permit to the Intermountain Power Service Corpora-

tion (Intermountain Power) authorizing the construction and operation of an additional 950–megawatt coal-fired power plant at the Intermountain Power Plant in Millard County, Utah. Shortly thereafter, the Sierra Club filed a petition before the Utah Air Quality Board (the Board), objecting to the permit and seeking to intervene in all related proceedings. The Board denied the Sierra Club's petition, declaring that the Sierra Club did not have standing. We hold that the Sierra Club does have standing to challenge the permit.

## BACKGROUND

¶ 2 On October 15, 2004, the Utah Division of Air Quality issued an approval order (the order) granting a permit to Intermountain Power to construct and operate an additional 950–megawatt coal-fired power plant at the Intermountain Power Plant near Delta, in Millard County, Utah. Delta is located near the Colorado Plateau, an area known for stunning geography and outdoor recreational sites, such as Capitol Reef National Park. It also borders the Great Basin Desert.

¶ 3 Following the issuance of the order, the Sierra Club and Grand Canyon Trust (collectively, the Sierra Club) filed a Request for Agency Action with the Board, claiming the proposed modification to the Intermountain Power Plant failed to comply with the federal Clean Air Act, 42 U.S.C. §§ 7401 to 7671q (2000), the Utah Air Conservation Act, Utah Code Ann. §§ 19–2–101 to –127 (2003 & Supp.2005), and the Utah Administrative Procedures Act, Utah Code Ann. §§ 63–46b–0.5 to –23 (2004 & Supp.2005). The Sierra Club's Request for Agency Action asked the Board to declare the order for the proposed power plant expansion illegal, revoke the approval order, and additionally or alternatively remand the order with instructions that the Utah Air Quality Division comply with the law and undertake the proper analysis as part of the permitting process. As required by the Utah Administrative Code, the Sierra Club filed a Statement of Standing and Petition to Intervene in conjunction with its Request for Agency Action. Utah Admin. Code r. 307–103–6(3) (2006). It accompanied its petition with the affidavits of Brian Cass,

Stephen Trimble, and Ray Bloxham, persons belonging to either the Sierra Club or the Grand Canyon Trust.

¶ 4 Mr. Cass is an Arizona resident who owns a home in Boulder, Utah and is a current member of the Grand Canyon Trust. Mr. Cass is a videographer who has filmed and produced documentaries on the Colorado Plateau and the Escalante River. His documentaries focus on "the scenic beauty of the area" and on the area's "archaeological and paleontological" resources. Mr. Cass also uses the Colorado Plateau for recreation. His affidavit alleges that if Intermountain Power is allowed to expand its current plant, the emissions from that plant will impair the visibility around his home in Boulder, Utah, and of the Colorado Plateau. In fact, he states that he has already "noticed that when visibility is impaired from pollution, [he] cannot see as far, the colors of the land forms are muted, and distant formations [are] less distinct." According to Mr. Cass, this decreased visibility will adversely affect his livelihood as a videographer. Mr. Cass' affidavit also expresses his concern that the emissions from the proposed plant will harmfully affect his health and his family's health, negatively impact vegetation and soil around his home, decrease the value of his property, and contribute to global warming.

¶ 5 Mr. Trimble is a resident of Salt Lake County who owns property and a home in Torrey, Utah, to which he travels approximately twice a month. He currently belongs to the Sierra Club. Mr. Trimble is a photographer, author, and naturalist who has photographed and written about the Colorado Plateau and the Great Basin Desert. Mr. Trimble's works specifically focus on the scenic beauty, flora and fauna, and "magnificent vistas" of the areas. Mr. Trimble's travels have repeatedly taken him to Delta, Utah. In his affidavit, Mr. Trimble alleges that the operation of the expanded plant will create emissions that will impair the visibility around his Torrey home, on the Colorado Plateau, and in the Great Basin Desert. According to him, this will adversely affect his economic livelihood as an author and a photographer, particularly because he cannot take "quality photographs" when visibility is impaired by pollution. Mr. Trimble also expresses concern that the plant's emissions will affect his recreational interests in the Colorado Plateau and the Great Basin Desert. Particularly, he worries that the impaired visibility from pollution will "obscure[ ] dark night skies." He fears the same emissions will impair his health and his family's health when they visit their Torrey home and recreate in the area. Specifically, he is concerned about the "levels of mercury, particulate matter, sulfur dioxide, and carbon dioxide" that the expanded plant will emit. Additionally, Mr. Trimble believes the emissions will decrease the value of his Torrey property and adversely impact the "water quality, wildlife, wildlife habitat, vegetation and soils" around his Torrey home and on the Colorado Plateau.

¶ 6 Finally, Mr. Bloxham is a member of the Sierra Club who currently resides in Salt Lake County. He and his family frequently travel to the Great Basin Desert and the Colorado Plateau. Due to these travels, he has driven through Delta many times. Most recently, he traveled through Delta in November 2004. At that time, he observed the air emissions from the current plant. Mr. Bloxham is concerned that the proposed expansion of the power plant will produce emissions that will impair the visibility around the areas he enjoys visiting and will particularly harm the area's "outstanding vistas." Indeed, he states that he has already noticed that "when visibility is impaired from pollution, [he] cannot see as far, the colors of the land forms are muted, and distant formations [are] less distinct." He is also concerned that the emissions will impair his health and his family's health when they travel to the Great Basin Desert and the Colorado Plateau. Specifically, he points to the "levels of mercury, particulate matter, sulfur dioxide, and carbon dioxide contained" in the proposed plant's emissions. Mr. Bloxham also alleges the emissions will contribute to "global warming and climate change, which in turn, will further adversely impact the Colorado Plateau and the Great Basin Desert . . . and every aspect of [his] life."

¶ 7 In response to the Sierra Club's petition and affidavits, the Millard County Com-

mission (the Commission) filed a Petition to Intervene,[1] claiming it was the most appropriate party to represent "the health, environmental and economic interest of those living, working, and playing near the plant." Unlike the Sierra Club, however, the Commission argued that the proposed plant expansion was in the best interests of Millard County.

¶ 8 The Board held a hearing to determine whether the Sierra Club and the Commission would be permitted to intervene. After the conclusion of the hearing, the Board denied the Sierra Club's petition, holding it could not establish a distinct and palpable injury because its affiants expressed only generalized concerns, it had not proffered adequate evidence regarding causation, and it was not the most appropriate party. Specifically, the Board held that the Sierra Club's affiants' "allegations of effect on visibility, concern for public health, and global warming [were] general public concerns that [did] not establish a personal, particularized stake in the issuance of the permit" because the concerns were shared by the public at large. The Board also held that the Sierra Club was not the "most appropriate entity" and that the issues were not of "such great importance [to] warrant standing." Because the Board denied the Sierra Club's petition, it did not need to address Millard County's petition, which was only filed in response to the Sierra Club's petition.

¶ 9 Following the Board's ruling, the Sierra Club filed a Petition for Review with the Utah Court of Appeals, seeking reversal of the Board's decision to deny it standing. The court of appeals certified this question to this court pursuant to Utah Code section 78–2a–3(3) (2002). We have jurisdiction under Utah Code section 78–2–2(3)(b) (2002).

## STANDARD OF REVIEW

¶ 10 We review an agency's standing determinations for correctness, granting no deference to the Board's decision. *Sierra Club v. Utah Air Quality Bd.*, 2006 UT 74, ¶ 15, 148 P.3d 960, 2006 WL 3359662 (*Sierra Club v. Sevier Power Co.*).[2] However, this court may grant relief only if the "person seeking judicial review has been substantially prejudiced" by the agency's decision. Utah Code Ann. § 63–46b–16(4) (2004). "A party has been substantially prejudiced if 'the alleged error was not harmless.'" *WWC Holding Co. v. Pub. Serv. Comm'n*, 2001 UT 23, ¶ 7, 44 P.3d 714 (quoting *Mountain Fuel Supply Co. v. Pub. Serv. Comm'n*, 861 P.2d 414, 423 (Utah 1993)).

## ANALYSIS

¶ 11 In *Sierra Club v. Sevier Power Co.*, 2006 UT 74, 148 P.3d 960, which issued concurrently with this opinion, we clarified that there are "two means by which a party can establish standing" before the courts of this state. *Id.* ¶ 18. The traditional test requires the petitioning party to establish a "distinct and palpable injury." *Id.* However, if the petitioning party does not have standing under the traditional test, that party may still have standing if it can demonstrate that it is an appropriate party asserting a matter of great public importance. *Id.* We will discuss the Sierra Club's standing under each of these tests below.

### I. THE SIERRA CLUB HAS STANDING UNDER THE TRADITIONAL TEST

¶ 12 Under the traditional test for standing, the party must allege that it has suffered or will " 'suffer[ ] some distinct and

1. Pacificorp also filed a Petition to Intervene in response to the Sierra Club's Request for Agency Action and Petition to Intervene. Pacificorp is not a party to the current proceeding, and its petition is not relevant to our decision in this case.

2. We realize that the logical short designation for the companion case would be *Sierra Club I*. However, the Utah Court of Appeals has already issued two opinions in which the Sierra Club was

a party—*Sierra Club v. Department of Environmental Quality*, 857 P.2d 982 (Utah Ct.App. 1993), and *Sierra Club v. Utah Solid and Hazardous Waste Control Board.*, 964 P.2d 335 (Utah Ct.App.1998). Those opinions have become known as *Sierra Club I* and *Sierra Club II*, respectively. Thus, for clarity's sake, we refrain from using similar designations here and instead refer to the cases before us by the names of the power companies that are parties to the disputes.

palpable injury that gives [it] a personal stake in the outcome of the legal dispute.' " *Sierra Club v. Sevier Power Co.,* 2006 UT 74, ¶ 19, 148 P.3d 960 (alteration in original) (quoting *Jenkins v. Swan,* 675 P.2d 1145, 1148 (Utah 1983)). "When determining whether a party has suffered a distinct and palpable injury, we engage in a three-step inquiry." *See id.* First, the petitioning party must claim that it "has been or will be 'adversely affected by the [challenged] actions.' " *Id.* (alteration in original) (quoting *Jenkins,* 675 P.2d at 1150). Second, the party must "allege a causal relationship 'between the injury to the [party], the [challenged] actions and the relief requested.' " *Id.* (alteration in original) (quoting *Jenkins,* 675 P.2d at 1150). Third, the requested relief must be " 'substantially likely to redress the injury claimed.' " *Id.* (quoting *Jenkins,* 675 P.2d at 1150). "If the party can satisfy these three criteria, [it] has standing to pursue its claims before the courts of this state." *Id.*

¶ 13 In this case, we address the traditional criteria through the lens of associational standing. An association, such as the Sierra Club, has standing if its individual members have standing and the participation of the individual members is not indispensable to the resolution of the case. *Utah Rest. Assoc. v. Davis County Bd. of Health,* 709 P.2d 1159, 1163 (Utah 1985). Thus, we must assess whether the Sierra Club's individual members have standing to challenge the order. We hold that they do; the Sierra Club's affiants have identified personal adverse effects, sufficient causation, and redressability. In addition, their individual participation is not essential to the resolution of this case.

¶ 14 The Sierra Club's affiants have satisfied the first traditional standing requirement because they have alleged that the order approving the plant expansion adversely affects their interests. Mr. Cass and Mr. Trimble have pointed to the detrimental impact the proposed expansion will have on their economic livelihoods. Mr. Cass' ability to film and Mr. Trimble's ability to photograph the Colorado Plateau will be significantly impaired if the emissions from the expansion unlawfully decrease visibility around the Colorado Plateau. Moreover, damage to the soils, vegetation, and wildlife around the Colorado Plateau may affect their abilities to produce documentaries or publish books about the region. As we discussed in *Sierra Club v. Sevier Power Co.,* their allegations "are not generalized to everyone in the area; [rather] these potential injuries affect only those who rely on the area and its environmental quality to make a living." 2006 UT 74, ¶ 23, 148 P.3d 960.

¶ 15 We conclude, furthermore, that the Sierra Club's affiants have identified sufficient adverse effects even without Mr. Cass' and Mr. Trimble's allegations that the plant will affect their economic livelihoods. All three affiants have claimed the proposed expansion will harm their health, their families' health, and their recreational interests in the area. In addition, Mr. Cass and Mr. Trimble have alleged the proposed plant expansion will decrease their property values. As we discussed in *Sierra Club v. Sevier Power Co.,* health, recreation, and property interests are legally cognizable interests for standing purposes. *See id.* ¶¶ 24, 30–31. While, as in that case, the affiants' concerns may be shared by many who live near Delta or who participate in recreational activities around the Colorado Plateau, the affiants "have not complained about the impact of the plant's emissions on the community in general, but have claimed that the emissions will directly affect them and their families." *See id.* ¶ 24. "That others may also share their concerns and be subject to the same specific, individualized injuries does not make the potential harms any less personal" to the affiants in this case. *Id.*

¶ 16 Moreover, as in *Sierra Club v. Sevier Power Co.,* the injuries alleged in this case have been reduced to a concrete dispute. *Id.* ¶ 26. The issue is "whether the Executive Secretary complied with various state and federal laws in granting the permit" for the expansion to Intermountain Power's current plant. *Id.* "This is a concrete dispute regarding the potentially harmful results of the Executive Secretary's alleged failure to follow existing law, and not merely an academic dispute about the environmental harms of

coal-fired power plants in general." *Id.* While some of the affiants' claimed injuries may be shared by all those who live near Delta or use the Colorado Plateau for recreational activities, the affiants in this case all have a direct interest in the dispute as their economic livelihood, health, and property values are at stake. *Id.* Finally, there is no concern about the Board resolving a question that is best left to another branch of government because the proper branches of government have already passed the Clean Air Act, 42 U.S.C. §§ 7401 to 7671q (2000), the Utah Air conservation Act, Utah Code Ann. §§ 19–2–101 to –127 (2003 & Supp.2005), and the Utah Administrative Procedures Act, Utah Code Ann. §§ 63–46b–0.5. to –23 (2004 & Supp.2005). *Id.* The affiants in this case merely seek the opportunity to ensure that the Executive Secretary complies with these laws. *Id.* We therefore hold that the injuries identified by the affiants in this case "are sufficient to satisfy the 'adverse effects' requirement under the traditional standing test." *Id.*

¶ 17 Having determined the Sierra Club's affiants have shown a distinct and palpable injury, we now turn to whether they have alleged "a plausible connection between their injuries and the order authorizing" the expansion of the plant. *Id.* ¶ 32. In *Sierra Club v. Sevier Power Co.,* we held that the affiants had met this burden. *Id.* We likewise hold the affiants in this case have alleged a plausible connection between their injuries and the order. The Executive Secretary is responsible for denying or granting permits for the construction and operation of the plant expansion. Thus, his decision to grant the order is "directly connected" to the expansion of the plant and any resulting harms. *See id.* Moreover, the affidavits point to specific aspects of the plant and connect them to specific harms, rather than raising the general allegation that the mere presence of a coal-fired power plant is inherently harmful. *See id.* For example, the affidavits allege that the emission of "mercury, particulate matter, sulfur dioxide, and carbon dioxide" have harmful health effects and "will adversely affect the water quality, wildlife, wildlife habitat, [and] vegetation and soils" around the Colorado Plateau. Likewise, the affiants have stated that they have already noticed that on highly polluted days, "[they] cannot see as far, the colors of the land forms are muted, and [the] distant formations [are] less distinct." Although the affiants and the Sierra Club have not yet presented scientific evidence supporting their claims, they have argued that they could prove causation,[3] and we think their claims present a plausible connection between the emissions and the alleged health and environmental effects. Thus, we believe the Sierra Club has satisfied the causation requirement of the traditional test. *See id.* (recognizing that petitioners need not prove causation at the standing phase to the same extent they would need to prove it to obtain relief at trial).

¶ 18 Finally, the Board has the ability to redress the affiants' claimed injuries. *Id.* ¶ 33. The Sierra Club has requested that the Board declare the air emissions permit illegal, revoke the Executive Secretary's order, and remand the matter to the Division of Air Quality for further analysis. The Board is the only party with the authority to grant this relief, thus it can redress the Sierra Club's identified adverse effects by

3. In the Sierra Club's Reply to Intermountain Power Service Corporation's Opposition to Sierra Club's Standing, the Sierra Club cited specific sources supporting its proposition that once the plant is operational, the plant's emissions could create health problems. For example, the Sierra Club quoted the Environmental Protection Agency as stating, on its website, "research indicates that air pollution in the form of particulate matter ... is linked to thousands of excess deaths and widespread health problems." Likewise, the Sierra Club has cited an article asserting that children exposed to mercury emissions from American power plants have suffered from diminished intelligence as a result of the exposure. Sierra Club's Reply (citing Leonardo Trasande et al., *Public Health and Economic Consequence of MethylMercury Toxicity to the Developing Brain,* Environmental Health Perspectives, Feb. 28, 2005.).

We mention the Sierra Club's sources only to show that it has alleged the existence of evidence of a causal link between the plant's emissions and the alleged harms. By mentioning the specific sources cited by the Sierra Club, we do not in any way comment upon the sources' credibility or scientific value.

declaring the permit illegal or by referring it to the Division of Air Quality for further analysis to ensure that the Executive Secretary's order complies with state and federal law.

¶ 19 We therefore conclude that the Sierra Club, through its members, has alleged a distinct and palpable injury by pointing to specific injuries that the plant will cause and that the Board can remedy by granting the requested relief. Moreover, the individual participation of the Sierra Club's members is not necessary to the resolution of this case. Thus, the Sierra Club has satisfied our traditional criteria and is entitled to standing to challenge the order approving of the expansion to the plant.

## II. THE SIERRA CLUB HAS STANDING UNDER THE ALTERNATIVE TEST

¶ 20 We hold, alternatively, that the Sierra Club has standing under the alternative test. A party has standing under the alternative test if it is an appropriate party asserting an issue of public importance. *Sierra Club v. Sevier Power Co.*, 2006 UT 74, ¶ 35, 148 P.3d 960. Under the alternative test, an intervenor qualifies as an appropriate party where it has " 'the interest necessary to effectively assist the court in developing and reviewing all relevant legal and factual questions' " and where the issues are "unlikely to be raised" if the party is not given standing. *Id.* ¶ 36 (quoting *Jenkins v. Swan*, 675 P.2d 1145, 1150 (Utah 1983)). Once a party satisfies the appropriate party requirement, it must then demonstrate that it seeks to raise issues that " 'are of sufficient public importance in and of themselves' to warrant granting the party standing." *Id.* ¶ 39 (quoting *Jenkins*, 675 P.2d at 1150). This requires that "the court determine not only that the issues are of a sufficient weight but also that they are not more appropriately

addressed by another branch of government." *Id.*

¶ 21 Here, the Sierra Club is an appropriate party. As an environmental group with members that will be directly affected by the plant's expansion, the Sierra Club has an interest in ensuring that the expanded plant "complies with all applicable state and federal environmental laws as well as with state administrative procedures, thus preventing any needless and unlawful pollution or other environmental destruction." *Id.* ¶ 42. Indeed, in this case the Sierra Club is the only party seeking to raise the issues of the plant's detrimental effects on health, the environment, property values, and recreational interests. Furthermore, because the Sierra Club's purpose is environmental protection, it "has the interest and expertise necessary to investigate and review all relevant legal and factual questions" relating to the proposed expansion of the plant. *Id.* Thus, we hold that the Sierra Club is an appropriate party in this case.

¶ 22 Moreover, the Sierra Club raises issues of sufficient public importance. The expanded plant will be emitting hazardous chemicals. Given the plant's proximity to homes and recreational areas, including Capitol Reef National Park, an area protected by the federal Clean Air Act,[4] "the Executive Secretary must comply with all applicable state and federal laws." *Id.* ¶ 44. To ensure that this happens, it is important that those persons who will be directly affected by the alleged violations of state and federal law have the opportunity to be heard. Moreover, the Sierra Club's "allegations that the Executive Secretary failed to comply with state and federal law are not more appropriately addressed by other branches of government." *Id.* ¶ 44. Rather, the legislative and executive branches have already addressed these issues by passing the Clean Air Act, 42 U.S.C. §§ 7401 to 7671q (2000), the Utah Air Conservation Act, Utah Code Ann. §§ 19–2–101 to –127 (2003 & Supp.2005), and the Utah

---

4. The Federal Clean Air Act provides that all national parks exceeding six thousand acres are class I Federal areas. 42 U.S.C. § 7472(a)(4) (2000). Congress has "declare[d] as a national goal the prevention of any future, and the remedying of any existing, impairment of visibility in

mandatory class I Federal areas which impairment results from manmade air pollution." 42 U.S.C. § 7491(a)(1) (2000). Capitol Reef National Park is a class I Federal area. Utah Admin. Code r. 307–405–4(1) (2006).

Administrative Procedures Act, Utah Code Ann. §§ 63–46b–0.5 to –23 (2004 & Supp. 2005). The Sierra Club "is merely seeking compliance with these laws, and thus is entitled to petition the Board for that relief" under the alternative test. *Sierra Club v. Sevier Power Co.*, 2006 UT 74, ¶ 44, 148 P.3d 960.

## CONCLUSION

¶ 23 We hold that the Board erred in denying standing to the Sierra Club. In accordance with the Administrative Procedures Act, we also hold that the Board's decision substantially prejudiced the Sierra Club by denying it the opportunity to challenge the Executive Secretary's order or to defend its interests. We therefore reverse and remand to the Board with instructions to allow the Sierra Club to intervene in the proceedings.

¶ 24 Associate Chief Justice WILKINS, Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Chief Justice DURHAM's opinion.