2006 UT 74

**UTAH CHAPTER OF the SIERRA CLUB, a non-profit organization, and Grand Canyon Trust, a non-profit organization, Petitioners,**

v.

**UTAH AIR QUALITY BOARD, an agency of the State of Utah, and Sevier Power Company, Respondents.**

No. 20050455.

Supreme Court of Utah.

Nov. 21, 2006.

Joro Walker, Sean Phelan, Salt Lake City, for petitioners.

Mark L. Shurtleff, Att'y Gen., Fred G. Nelson, Paul McConkie, Asst. Att'ys Gen., Salt Lake City, Fred W. Finlinson, Saratoga Springs, for respondents.

On Certification from the Utah
Court of Appeals

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 The Executive Secretary of the Utah Division of Air Quality granted a permit to the Sevier Power Company authorizing the construction and operation of a 270–megawatt coal-fired power plant in Sevier County, Utah. Shortly thereafter, the Sierra Club filed a petition before the Utah Air Quality Board (the Board) objecting to the permit and seeking to intervene in all related proceedings. The Board denied the Sierra Club's petition, declaring that the Sierra Club did not have standing. We hold that the Sierra Club does have standing to challenge the permit. In so concluding, we take the opportunity to reiterate and clarify Utah's standing law.

## BACKGROUND

¶ 2 On October 12, 2004, the Executive Secretary of the Division of Air Quality signed an approval order (the order) granting a permit to the Sevier Power Company to construct and operate a 270–megawatt coal-fired power plant (the plant) near Sigurd, in Sevier County, Utah. Sigurd is located near the Colorado Plateau, an area known for stunning geography and outdoor recreational sites such as Boulder Mountain and Capitol Reef National Park.

¶ 3 After the Executive Secretary signed the order, two parties sought to intervene.[1] On November 1, 2004, the Sevier County Citizens for Clean Air and Water (the Citizens' Group) filed a Request for Agency Action with the Board. The Utah Chapter of the Sierra Club and the Grand Canyon Trust (collectively, the Sierra Club) followed on November 12, 2004, by filing a separate Request for Agency Action. The Sierra Club sought review of the order, claiming that the Executive Secretary's approval of the plant failed to comply with the federal Clean Air Act, 42 U.S.C. §§ 7401 to 7671q (2000), the Utah Air Conservation Act, Utah Code Ann. §§ 19–2–101 to –127 (2003 & Supp.2005), and the Utah Administrative Procedures Act, Utah Code Ann. §§ 63–46b–0.5 to –23 (2004 & Supp.2005). The request asked the Board to declare the order illegal, revoke the order, and alternatively or additionally remand the

---

1. A third party, Pacificorp, also petitioned to intervene. Pacificorp is not a party to the current proceeding. Therefore, we do not address its petition.

order to the Utah Division of Air Quality with instructions that the agency undertake the proper analysis and comply with all applicable laws. As required by the Utah Administrative Code, the Sierra Club filed a Statement of Standing and Petition to Intervene in conjunction with its Request for Agency Action. Utah Admin. Code r. 307–103–6(3) (2006). In support of its Statement of Standing, the Sierra Club filed the affidavits of Brian Cass, Cindy Ciciliano Roberts, and Howard Cherry, persons belonging to either the Sierra Club or the Grand Canyon Trust.

¶ 4 Mr. Cass, a member of the Grand Canyon Trust, is an Arizona resident who owns property and a home in Boulder, Utah, which is located to the southeast of Sigurd. Mr. Cass is a videographer who has filmed and produced documentaries on the Colorado Plateau. Additionally, he uses the Colorado Plateau for recreation. In his affidavit, Mr. Cass alleges the plant will emit pollutants that will impair visibility around his home and on the Colorado Plateau and that this decreased visibility will affect his livelihood as a videographer. Moreover, Mr. Cass states that the emissions from the plant will contribute to global warming and climate change, which will further adversely impact the Colorado Plateau's ecosystem. His affidavit also alleges that, if approved, the plant's emissions will impair his health and his family's health and decrease the value of his property.

¶ 5 Ms. Roberts lives in Sigurd and is a member of the Sierra Club. She also belongs to the Citizens' Group. Ms. Roberts and her husband live on a 25–acre farm that is located less than one mile from the proposed site. They also farm an additional 328 acres, 133 of which they own and 195 of which they lease, approximately four miles from the proposed site. In addition, Ms. Roberts and her family use the Sigurd area for recreational activities, including birdwatching and fishing. Ms. Roberts' affidavit claims that if the plant is approved she will suffer injury because the plant will emit pollutants that will contaminate the soil and damage her crops, thereby jeopardizing her livelihood. Likewise, she argues that the plant's emissions will contaminate the waterways that she and her family

use to irrigate the crops they later eat. Ms. Roberts also asserts that the emissions from the plant's construction and operation will negatively affect her health as well as the health of her children and neighbors. She believes that if built, the plant's emissions will diminish visibility in the area, increase the number of pollution-related inversions, and decrease her property values.

¶ 6 Finally, Mr. Cherry resides in Sevier County and is a member of the Sierra Club. His current home is about eight miles from the proposed plant site, and he regularly travels to Sigurd. Mr. Cherry's affidavit states that he is concerned that the plant's emissions will cause adverse health effects, including an increase in heart and lung problems. He also maintains that the plant will increase the severity of the area's inversions. For the most part, Mr. Cherry expresses general concerns about the adverse health effects and the inversions. He does allege one specific injury, however, claiming that "[he] will be adversely affected by the proposed power plant because visibility will deteriorate in the area."

¶ 7 On April 13, 2005, the Board held a hearing to determine whether the Citizens' Group and the Sierra Club had standing to intervene. The Board granted the Citizens' Group's petition, finding the Citizen's Group was "the most appropriate entity to bring the action" and that it had alleged "a distinct and palpable injury" resulting from the order. However, the Board denied the Sierra Club's petition. According to the Board, the Sierra Club had not demonstrated a distinct and palpable injury because its members' allegations of adverse public health effects, decreased visibility, and environmental harms were too general, the Sierra Club did not proffer any evidence that the alleged adverse impacts were caused by the order, and the affidavits did not demonstrate a connection between the alleged improper permit and a particular injury to the three affiants. Moreover, the Board found that the Sierra Club was not the most appropriate party and held that the issues were not a "matter of significant public importance that would warrant granting the petition to intervene."

¶ 8 Following the Board's denial, the Sierra Club filed a Petition for Review with the Utah Court of Appeals, seeking review of the Board's decision to deny standing. The court of appeals certified the question of the Sierra Club's standing to this court pursuant to Utah Code section 78–2a–3(3) (2002). We have jurisdiction under Utah Code section 78–2–2(3)(b) (2002).

## STANDARD OF REVIEW

■ ¶ 9 The Utah Administrative Procedures Act (the Act) governs our review of a state administrative agency's decision. Utah Code Ann. §§ 63–46b–0.5 to –23 (2004 & Supp.2005). Where, as in this case, a party is seeking review of a formal agency action, Utah Code section 63–46b–16 supplies the applicable standards of review. *Id.* § 63–46b–16 (2004). When reviewing formal agency decisions, we apply differing standards of review depending on the type of question before us. *WWC Holding Co. v. Pub. Serv. Comm'n,* 2001 UT 23, ¶ 7, 44 P.3d 714 (citing Utah Code Ann. § 63–46b–16(4)). Under the Act, we review factual findings for "substantial evidence"; in other words, we affirm an agency's findings of fact where they are "supported by substantial evidence when viewed in light of the whole record before the court." Utah Code Ann. § 63–46b–16(4)(g). We review questions of law for correctness, *id.* § 63–46b–16(4)(d), granting little or no deference to the agency's determination, *Esquivel v. Labor Comm'n,* 2000 UT 66, ¶ 13, 7 P.3d 777. Finally, when we review questions of

"ultimate fact, mixed findings of fact and law, and [the agency's] interpretation of the operative provisions of statutory law it is empowered to administer, [agency] findings must be rationally based and are set aside only if they are imposed arbitrarily and capriciously or are beyond the tolerable limits of reason."

*Assoc. Gen. Contractors v. Bd. of Oil, Gas & Mining,* 2001 UT 112, ¶ 18, 38 P.3d 291, (alterations in original) (quoting *Williams v. Pub. Serv. Comm'n,* 754 P.2d 41, 50 (Utah 1988)).

¶ 10 In the case before us, the parties disagree over whether standing is a question of law or a mixed question of law and fact. We elaborated upon the differences between questions of law and mixed questions in the administrative law context in *Associated General Contractors,*[2] 2001 UT 112, ¶ 18, 38 P.3d 291. There we explained that

general questions of law include constitutional questions, rulings concerning an agency's jurisdiction or authority, interpretations of common law principles, and interpretations of statutes unrelated to the agency. Conversely, instances involving ultimate facts, mixed findings of fact and law, and [an agency's] interpretation of the ... statutory law it is empowered to administer are limited to situations where the agency has been granted explicit or implicit discretion under the statute, where the agency possesses expertise concerning the operative provisions at issue, or where the agency is otherwise in a better position than the courts to assess the law due to its experience with the relevant subject matter.

*Id.* (alterations in original) (citations and internal quotation marks omitted).

¶ 11 In order to resolve whether standing is a question of law or a mixed question of law and fact in the administrative law context, we turn to the nature of the standing requirement. Standing is a concept "rooted in the historical and constitutional role of the judiciary" as one of three separate and equal branches of government. *Jenkins v. Swan,* 675 P.2d 1145, 1149 (Utah 1983). Through our case law, we have developed the requirement that a party have standing in order "to confine the courts to a role consistent with the separation of powers, and to limit the

---

**2.** *Associated General Contractors* addressed judicial review of an agency's action in its rulemaking capacity. 2001 UT 112, ¶ 1, 38 P.3d 291. Nevertheless, like the agency action before us in this case, *Associated General Contractors* involved review of a formal agency action and was thus governed by Utah Code section 63–46b–16. Section 63–46b–16 governs the standard of review for all formal agency actions and does not distinguish between an agency's actions in its rulemaking and decision-making capacity. Therefore, the *Associated General Contractors'* definition applies to the case before us.

jurisdiction of the courts to those disputes which are most efficiently and effectively resolved through the judicial process." *Id.*

■ ¶ 12 Given that standing has evolved through our case law in order to protect the separation of powers under the Utah Constitution, we think that standing falls squarely within the administrative law definition of a "general question of law," as discussed in *Associated General Contractors*, 2001 UT 112, ¶ 18, 38 P.3d 291. We recognize that administrative agencies are part of the executive branch and not the judicial branch; however, they are vested with adjudicative functions, and the same policies that apply to standing before the judicial branch also apply to controversies before administrative agencies. Indeed, the Utah Administrative Code requires that a party have standing and defers to our case law on that subject. *See* Utah Admin. Code r. 307–103–6(3) (2006) ("No person may initiate or intervene in any agency action unless that person has standing. Standing shall be evaluated using applicable Utah case law."). Thus, the fact that the Board does not technically operate within the judicial branch does not change our reliance on separation of powers considerations to determine that, in the administrative context, standing is a "general question of law."

■ ¶ 13 However, the Board's status as an administrative agency rather than a lower court does influence our classification of standing as a question of law in this case. In the non-administrative law context, standing would generally be considered a "mixed question" because it involves the application of a legal standard to a particularized set of facts. For example, when reviewing a lower court's standing determination we have stated that "the question of whether a given individual or association has standing to request a particular relief is primarily a question of law, although there may be factual findings that bear on the issue." *Kearns–Tribune Corp. v. Wilkinson*, 946 P.2d 372, 373 (Utah 1997). Nevertheless, in the administrative law context, standing is a "general question of law" because it is a judicial doctrine. As a court, we are in a better position than an agency to determine whether this doctrine has been properly interpret-

ed and applied, just as we are in a better position to review questions of constitutional and statutory interpretation. Moreover, the policy underlying the correctness standard of review for interpretation of constitutional, statutory, and common law issues applies equally to standing. The reason courts review an administrative agency's decisions of general law for correctness is "to ensure that [the law] is uniform throughout the jurisdiction." *Esquivel*, 2000 UT 66, ¶ 13, 7 P.3d 777 (citations and internal quotation marks omitted). Considering that standing triggers the court's, or the agency's, subject matter jurisdiction, we think it highly important that standing law be uniform throughout all Utah courts and agencies and therefore conclude that for the purposes of reviewing agency decisions, it is a "general question of law."

¶ 14 We find further support for our conclusion that standing is a general question of law in that standing does not fit within the administrative law definition of mixed questions of law and fact as set forth in *Associated General Contractors*, 2001 UT 112, ¶ 18, 38 P.3d 291. The Board does not have either explicit or implicit authority over standing issues pursuant to its enabling statute. *See* Utah Code Ann. §§ 19–2–104 (2003) (listing powers of the Air Quality Board with no mention of standing). While the Board does have the power to "hold hearings," *id.* § 19–2–104(3)(a), "enforce [its] orders by appropriate administrative and judicial proceedings, and institute judicial proceedings to secure compliance," *id.* § 19–2–104(3)(b), these provisions do not give it implicit authority to develop standing principles because standing is not within the Board's area of expertise. That the Board has been assigned some adjudicative functions does not implicitly give it any particular authority to interpret standing doctrine or other issues of general statutory, constitutional, or common law. Likewise, the Board is not "otherwise in a better position than the courts to assess the law due to its experience with the relevant subject matter." *Assoc. Gen. Contractors*, 2001 UT 112, ¶ 18, 38 P.3d 291. The courts have extensive experience when it comes to standing issues and are in a better position to correctly and uniformly apply Utah law.

¶ 15 We therefore conclude that standing is a question of law under the Act, and we review the Board's determination that the Sierra Club did not have standing for correctness, granting the Board's decision no deference. Regardless of the applicable standard of review, however, this court may grant relief only if it determines that the "person seeking judicial review has been substantially prejudiced" by the agency's ·decision. Utah Code Ann. § 63–46b–16(4). "A party has been substantially prejudiced if 'the alleged error was not harmless.'" *WWC Holding Co.*, 2001 UT 23, ¶ 7, 44 P.3d 714 (citing *Mountain Fuel Supply Co. v. Pub. Serv. Comm'n,* 861 P.2d 414, 423 (Utah 1993)).

¶ 16 Having established the relevant standard of review under the Act, we now turn to whether the Board erred in determining that Sierra Club does not have standing to challenge the order.

## ANALYSIS

¶ 17 Utah standing law "operates as gatekeeper to the courthouse, allowing in only those cases that are fit for judicial resolution." *Terracor v. Utah Bd. of State Lands & Forestry,* 716 P.2d 796, 798–99 (Utah 1986). By doing so, it ensures "that courts confine themselves to [the] resolution of those disputes most effectively ·resolved through the judicial process." *Id.* at 799. This limits judicial power and prevents the "significant inroad on the representative form of government" that would occur if courts cast themselves "in the role of supervising the coordinate branches of government" or as "an open forum for the resolution of political and ideological disputes about the performance of government." *Id.* (citations and internal quotation marks omitted).

¶ 18 The preeminent case on Utah standing law is *Jenkins v. Swan,* 675 P.2d 1145 (Utah 1983). In that case, we recognized that there are two means by which a party can establish standing—the traditional test and an alternative test. *Id.* at 1150–51. Since we first issued Jenkins, however, our treatment of standing principles has become somewhat convoluted, leading to occasional missteps in their application. Thus, we address whether the Sierra Club has standing under both tests and, in doing so, attempt to clarify the application of the standing principles first articulated in Jenkins.

## I. THE TRADITIONAL TEST

¶ 19 The first test we articulated in *Jenkins v. Swan,* 675 P.2d 1145, 1150 (Utah 1983), addresses the "traditional criteria" for standing. The traditional test is often referred to as the "distinct and palpable injury" requirement because the petitioning party must allege that it has suffered or will "suffer[ ] some distinct and palpable injury that gives [it] a personal stake in the outcome of the legal dispute." *Id.* at 1148. When determining whether a party has suffered a distinct and palpable injury, we engage in a three-step inquiry. *See id.* at 1150. First, the party must assert that it has been or will be "adversely affected by the [challenged] actions." *Id.* Second, the party must allege a causal relationship "between the injury to the party, the [challenged] actions and the relief requested." *Id.* Third, the relief requested must be "substantially likely to redress the injury claimed." *Id.* at 1149. If the party can satisfy these three· criteria, the party has standing to pursue its claims before the courts of this state.

¶ 20 The traditional test addresses whether the party has "a real and personal interest in the dispute." *Id.* at 1150. A party who satisfies all three of the traditional criteria will have the incentive to "fully develop[ ] all the material factual and legal issues in an effort to convince the court that the relief requested will redress the claimed injury." *Id.* Thus, the traditional standing test helps confine the courts' jurisdiction to cases appropriately resolved through the adversarial judicial process.

¶ 21 In this case, we must address the traditional criteria through the lens of associational standing. An association, such as the Sierra Club, has standing if its individual members have standing and the participation of the individual members is not necessary to the resolution of the case. *Utah Rest. Assoc. v. Davis County Bd. of Health,* 709 P.2d 1159, 1163 (Utah 1985). Thus, to determine

whether the Sierra Club has standing, we must assess whether its individual members have standing to challenge the order under the traditional test. We hold that they do; the Sierra Club's affiants have identified personal adverse effects, sufficient causation, and redressability. In addition, their individual participation is not essential to the resolution of this case.

¶ 22 Two of the Sierra Club's affiants, Mr. Cass and Ms. Roberts, have satisfied the first inquiry of the traditional test because they have alleged that the order approving the plant adversely affects them. Both Mr. Cass and Ms. Roberts claim that, once built, the plant will adversely impact their livelihoods. Mr. Cass argues the decreased visibility will impair his ability to film the Colorado Plateau, while Ms. Roberts maintains the pollution will damage the soil and, in turn, her crops. Both also allege that the pollutants emitted by the plant will harm their health and their families' health, devalue their property, and detrimentally impact the ecosystem of the Colorado Plateau, which they use for recreational activities.

¶ 23 These alleged adverse effects are sufficiently particularized to give Mr. Cass and Ms. Roberts a personal stake in the outcome of the dispute. Mr. Cass' and Ms. Roberts' allegations that the plant operations will damage their livelihoods are not generalized to everyone in the area; these potential injuries affect only those who rely on the area and its environmental quality to make a living. The injuries Mr. Cass may suffer as a videographer and Ms. Roberts may suffer as a farmer are separate and distinct from the potential injuries to other persons who either live in Sigurd or recreate around the Colorado Plateau and are not videographers or farmers.

¶ 24 We conclude, furthermore, that Mr. Cass and Ms. Roberts have identified sufficient adverse effects even without the allegations that the plant will affect their economic livelihoods. By claiming injuries to their health, property, and recreational activities, they have shown that they have a particularized stake in the outcome of the dispute. While these concerns may be shared by many who live in Sigurd or who participate in recreational activities around the Colorado Plateau, Mr. Cass and Ms. Roberts have not complained about the impact of the plant's emissions on the community in general, but have claimed that the emissions will directly affect them and their families. In other words, they are alleging private, rather than public, injuries. That others may also share their concerns and be subject to the same specific, individualized injuries does not make the potential harms any less personal to Mr. Cass and Ms. Roberts.

¶ 25 We recognize that in some settings this court has been hesitant to address injuries shared by too many members of the public. In *Society of Professional Journalists v. Bullock*, 743 P.2d 1166, 1174 (Utah 1987), we explained that this hesitancy is "rooted in concerns about courts deciding matters that are not properly reduced to a concrete dispute ... and in concerns about considering matters better dealt with by another branch of government." Recognizing that these underlying policies would not be offended, we relaxed our standing requirement in *Society of Professional Journalists* and held that anyone who claimed, attempted to exercise, and was denied a right of access to a judicial proceeding had suffered an adequate adverse impact to satisfy the standing requirement even though the adverse impact was shared by all members of that class. *Id.* In so holding, we reiterated that " '[i]t is difficult to make useful, all inclusive generalizations that determine whether standing exists in any given case, since the issue often depends on the facts of each case.' " *Id.* (quoting *Terracor v. Utah Bd. of State Lands & Forestry*, 716 P.2d 796, 799 (Utah 1986)). Thus, our holding in *Society of Professional Journalists* recognizes that there may be cases where it is appropriate to grant standing to persons who share the same or similar grievances as other individuals or groups.

¶ 26 The present case falls within this category. As in *Society of Professional Journalists,* none of the policies that have given rise to this court's past hesitancy to address injuries shared by all members of the general public would be offended by holding that Mr. Cass and Ms. Roberts, and in turn the Sierra Club, have standing. The issue is whether

the Executive Secretary complied with various state and federal laws in granting the permit for the plant. This is a concrete dispute regarding the potentially harmful results of the Executive Secretary's alleged failure to follow existing law, and not merely an academic dispute about the environmental harms of coal-fired power plants in general. While some of the injuries Mr. Cass and Ms. Roberts allege are shared by others who live and recreate near Sigurd, Mr. Cass and Ms. Roberts do have a direct interest in the dispute as their livelihood, health, and property values are at stake. Moreover, there is no concern about courts, or the Board, resolving questions that are best left to the other branches of government. In this case, the proper branches of government have already passed the Clean Air Act, 42 U.S.C. §§ 7401 to 7671q (2000), the Utah Air Conservation Act, Utah Code Ann. §§ 19–2–101 to—127 (2003 & Supp.2005), and the Utah Administrative Procedures Act, Utah Code Ann. §§ 63–46b–0.5 to—23 (2004 & Supp. 2005). Mr. Cass and Ms. Roberts, through the Sierra Club, are merely asking that they be given the opportunity to ensure that the Executive Secretary comply with and the Board enforce these laws. We therefore hold that even though there are others who have the same grievances as Mr. Cass and Ms. Roberts, the potential injuries raised by Mr. Cass and Ms. Roberts are sufficient to satisfy the "adverse effects" requirement under the traditional standing test.

¶ 27 While Mr. Cass and Ms. Roberts have adequately alleged that they will be adversely affected by the order, it is questionable whether the Sierra Club's third affiant, Mr. Cherry, has asserted a sufficiently particularized injury. His affidavit expresses general concerns about the plant with the exception of his allegation that he will be adversely affected by the deterioration of visibility.

Expressions of concern, without a claim of actual or potential injury to the party, are too generalized to qualify as a distinct and palpable injury under the traditional criteria. Mr. Cherry's general affidavit does not defeat the Sierra Club's standing, however; it is enough that two of the Sierra Club's members can establish a particularized stake in the outcome of the dispute. Because his affidavit is not essential to the Sierra Club's standing, we need not determine whether his concerns about decreased visibility, considered alone, would qualify as a sufficient adverse impact.

¶ 28 Our holding that Mr. Cass and Ms. Roberts have sufficiently asserted that the order adversely affects them does not open the door to standing too widely, removing all practical barriers to intervention by any third party in environmental litigation. Mr. Cass and Ms. Roberts have met the adverse effects requirement because they either live or recreate, or both, near the site of the plant and have alleged injuries that are particular to them, rather than expressing generalized concerns about the plant's impact on the public at large. Thus, while Mr. Cass and Ms. Roberts have identified a particularized injury, a Logan resident who does not have a home or recreational interests in the area probably could not allege sufficiently particularized adverse impacts, regardless of his or her concerns about pollution and its potential to harm the environment and public health. Such generalized interests are too attenuated to create a sufficient personal stake in the litigation and would not satisfy the adverse effects requirement. The determination of what claimed interests are sufficient and what interests are too attenuated must be made on a case-by-case basis, taking into account all relevant facts and the policies underlying our standing requirement.[3]

---

3. Generally, the determination of whether a plaintiff has alleged a sufficient interest in order to satisfy the adverse impact part of the traditional test can be made on the face of the pleadings. However, some cases require more extensive fact-finding in order to assess whether the plaintiff's interest in the dispute is sufficient to give rise to an adverse impact. For example, in *Washington County Water Conservancy District v. Morgan*, 2003 UT 58, 82 P.3d 1125, the plaintiff

alleged that its water use would be adversely affected by the approval of the defendant's application "to alter the nature, place of use, and points of diversion" of its water right. *Id.* ¶¶ 2, 19. Because the plaintiff's interest in the dispute depended upon whether the plaintiff's water originated from the same source as the defendant's water, the district court required the plaintiff to show a "measurable connection" between its water source and the defendant's water

¶ 29 Before considering whether the Sierra Club has satisfied the causation and redressability requirements, we wish to comment briefly on the Board's decision to deny standing to the Sierra Club but to grant it to the Citizens' Group. The Board held that, unlike the Sierra Club, the Citizens' Group had standing because it had alleged a sufficiently "distinct and palpable injury." Specifically, the Board stated that the Citizens' Group's "[a]ffidavits and statements include not only assertions of effect on visibility and the environment but contain specific claims of potential for or exacerbation of identified respiratory illnesses and other physical conditions on members and their families who live in close proximity to the plant." We reject the suggestion that a party must identify a risk to an existing health condition in order to have standing. If the emissions from the proposed power plant have the potential to harm the health of those persons who live in the area, we see no reason why those residents must actually develop a health problem before they have standing.

¶ 30 We are further troubled by the implication that the Board granted standing to the Citizens' Group over the Sierra Club because the Citizens' Group pointed to identified health concerns in addition to environmental harms. Standing was not designed to provide remedies solely for potential threats to health, but for all legally cognizable interests. The Sierra Club's affiants' claims of adverse effects to their livelihoods and recreation due to decreased visibility and environmental damage are valid interests for purposes of our standing analysis, regardless of whether they are accompanied by concerns about health. *See Lujan v. Defenders of Wildlife*,

504 U.S. 555, 562–63, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing."). We note, however, that while recreational interests are legally cognizable interests for purposes of our standing analysis, not all allegations of injury to a recreational interest will automatically qualify. For example, in *Defenders of Wildlife*, the United States Supreme Court recognized that aesthetic interests in wildlife are legally cognizable interests, but held that in order for a party to assert such an interest, the party had to show a direct and imminent injury to that interest. *Id.* at 564, 112 S.Ct. 2130. In that case, the affiants alleged that they had standing to challenge the government action based on their past visits to the endangered areas and their hope to revisit those same areas in the future. *Id.* However, the Court held that the affiants' past visits did not give them standing, noting "[p]ast exposure [did] not in itself show a present case or controversy ... if unaccompanied by any continuing, present adverse effects." *Id.* (citations and internal quotation marks omitted). Likewise, the Court held that the affiants' hopes to revisit the areas were insufficient to show injury to a legally protected interest because " 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Id.* (emphasis in original).

¶ 31 We agree that a plaintiff who alleges only past recreational exposure to a threatened area without any concrete plans to re-

source. *Id.* ¶¶ 19, 22–24. A trial was held to determine whether the water sources were connected. *Id.* ¶ 19. At trial, the plaintiff called expert witnesses and introduced "empirical testing" evidence to show the sources were connected. *Id.* ¶ 25. The defendant countered by calling its own expert witnesses, who testified that the sources were not connected. *Id.* The trial court did not find the plaintiff's witnesses and evidence persuasive, and held that the plaintiff did not have standing because it could not show it had a sufficient interest in the dispute, *id.;* the trial court therefore did not need to consider causation and redressability.

This court affirmed the trial court, holding that

Where expert witnesses disagree and where the party carrying the burden of establishing standing is unable to present empirical or measurable evidence of a direct connection between the sources from which the parties have rights to draw water, we cannot conclude that the trial court erred in finding the evidence inconclusive.

*Id.*

We note that while extensive fact-finding was required to determine the plaintiff's interest in *Washington County*, such cases are rare, and we do not believe this type of fact-finding is required to assess the affiants' interests in the case before us.

turn to that area would not have a sufficiently personalized stake in the dispute to challenge a proposed government action in the courts. However, Mr. Cass and Ms. Roberts have clearly established a legally cognizable recreational interest in that they both own homes in the threatened area and have demonstrated that they frequently use and will continue to use the area for recreation. Moreover, in this case, the Sierra Club's affiants also asserted concerns about health risks to them and their families. Thus, the Sierra Club's affiants' claims of the plant's adverse environmental effects and the resulting harms to their livelihood, recreational activities, and physical well-being satisfy the first part of our test. We leave for another day the challenge of further defining the extent of use a party must allege in order to prove that it has a legally protected recreational interest that entitles it to assert that interest before the courts of this state.

¶ 32 Having concluded that the Sierra Club's affiants have shown a distinct and palpable injury, we now turn to whether they have alleged a plausible connection between their injuries and the order authorizing the plant. The affiants have met that burden. Because the Executive Secretary is responsible for denying or granting permits for the construction and operation of the plant, his decision to grant the order is directly connected to the construction and operation of the plant and to any resulting harms. Furthermore, the affidavits allege that the greenhouse gas and other emissions from the plant will cause various injuries, including health problems, decreased visibility around the Colorado Plateau, soil damage, water pollution, and property devaluation. Rather than raising general allegations that the mere presence of a coal-fired power plant will cause the alleged harms, the affidavits point to specific aspects of the plant that will cause specific harms. For example, the affiants contend that the levels of "mercury, particulate matter, sulfur dioxide, and carbon dioxide contained in the emissions" as a potential cause of increased health problems, decreased visibility due to air pollution, and harm to local fish and wildlife.[4] Likewise, Mr. Cass, the videographer, uses his prior experience to support his claims that the plant's emissions will increase pollution in and decrease visibility, specifically stating that "[he has noticed] that when visibility is impaired from pollution, [he] cannot see as far, the colors of the land forms are muted, and distant formations [are] less distinct." While it is true the affiants have not yet had the opportunity to present scientific evidence that proves the plant will cause the alleged harms, they have alleged that they could prove causation,[5] and that is all that is required at this phase. Standing questions arise early in the litigation, usually before

4. In its Request for Agency Action, the Sierra Club identifies the harmful pollutants the plant will emit in violation of both state and federal law. Specifically, the Sierra Club names carbon dioxide, nitrous oxide, mercury, particulate matter, and sulfur dioxide. We recognize that not all of the affiants specifically identify the pollutants. However, we think it is adequate that the affiants allege that the plant will emit pollutants, as they all have done. It is appropriate for the Sierra Club, as the association representing the affiants, to supplement the affidavits with information about the specific pollutants, particularly considering that the Sierra Club is in a better position to know about specific pollutants than the average concerned citizen.

5. In the Reply of the Sierra Club and Grand Canyon Trust to Sevier Power Company's Opposition to the Petition for Standing, which was filed before the Board, the Sierra Club cited specific sources supporting its proposition that once the plant is operational, the plant's emissions could be the source of health problems. For example, the Sierra Club quoted the Environmental Protection Agency as stating, on its website, "research indicates that air pollution in the form of particulate matter ... is linked to thousands of excess deaths and widespread health problems." Likewise, the Sierra Club has cited an article asserting that children exposed to mercury emissions from American power plants have suffered from diminished intelligence as a result of the exposure. Sierra Club's Reply (citing Leonardo Trasande et al., *Public Health and Economic Consequence of MethylMercury Toxicity to the Developing Brain*, Environmental Health Perspectives, Feb. 28, 2005.).

We mention the Sierra Club's sources only to show that the Sierra Club has alleged the existence of evidence suggesting a causal link between the plant's emissions and the alleged harms. By mentioning the specific sources cited by the Sierra Club, we do not in any way comment upon the sources' credibility or scientific value.

discovery and the introduction of evidence. *See Jenkins,* 675 P.2d at 1150 ("[S]tanding questions are usually raised prior to the introduction of any evidence."). Thus, a plaintiff claiming standing under the traditional criteria does not need to prove causation to the same extent it will be required to prove it at trial. *Id.* Otherwise, the investigation of standing-related facts would, in many cases, supplant the trial process on the merits of the underlying claim. Moreover, it would be unduly burdensome for litigants to invest the time and money in gathering the evidence necessary to prove their claim only to be denied standing. Based on the foregoing, we believe that the affiants have alleged plausible causation; thus, the Sierra Club may conduct discovery and present evidence before the Board.

¶ 33 Finally, the Board has the power to redress the affiants' injuries. Through the Sierra Club, the affiants have requested that the Board declare the air emissions permit illegal, revoke the order, and remand the matter to the Division of Air Quality for further analysis. Because the Board is the only party with the authority to grant this relief, it has the power to redress the Sierra Club's injury by declaring the permit illegal or at least referring the permit to the Division of Air Quality for further analysis to ensure that the Executive Secretary's order authorizing the plant's operation complies state and federal law.

¶ 34 We therefore conclude that, like the members of the Citizens' Group, the Sierra Club's members have alleged a distinct and palpable injury that the plant will cause and that the Board can remedy by granting the requested relief. Although the number of affected members in the Sierra Club is far smaller than the 500 affected members of the Citizens' Group, this does not change the Sierra Club's associational standing. An association has standing to pursue the claims of its members, whether it be two or five hundred; there is no threshold number of members that an association must have as a prerequisite to standing. Moreover, there is no reason the individual participation of the Sierra Club's members is necessary to the resolution of this case. Thus, the Sierra

Club has satisfied our traditional criteria and is entitled to standing to challenge the order approving the proposed plant.

## II. THE ALTERNATIVE TEST

¶ 35 While the Sierra Club has satisfied the traditional test and thus has standing, we hold alternatively that the Sierra Club also has standing under the alternative standing test. In *Jenkins v. Swan,* we recognized that a failure to satisfy the traditional test is not necessarily fatal to a party's ability to assert an interest before the courts of this state. 675 P.2d 1145, 1150 (Utah 1983). Rather, *Jenkins* provides an alternative means by which a party can prove standing—by showing that it is an appropriate party raising issues of significant public importance. *Id.* We reexamine this test here.

¶ 36 Under the alternative test, a petitioning party must first establish that it is an appropriate party to raise the issue in the dispute before the court. *Id.* A party meets this burden by demonstrating that it has "the interest necessary to effectively assist the court in developing and reviewing all relevant legal and factual questions" and that the issues are "unlikely to be raised" if the party is denied standing. *Id.* We recognize that there is language in both *Jenkins* and subsequent cases suggesting that in making this determination the court may grant standing only to the party with the greatest interest in the case, or in other words, the *most* appropriate party. *See, e.g., id.* ("If the plaintiff does not have standing under the first step, we will then address the question of whether there is anyone who has a greater interest in the outcome of the case than the plaintiff."); *Sierra Club. v. Dept. of Envtl. Quality,* 857 P.2d 982, 987 (Utah Ct.App. 1993) (holding the Sierra Club was not the "most appropriate plaintiff"). We now conclude, however, that the notion that a court must find the *most* appropriate party, thereby limiting standing under the alternative criteria to only one party in any given case, is unnecessary and counter-productive. We think that in many cases, such as the one before us, there will be more than one party interested in the outcome of the case who can

effectively raise issues that would otherwise escape review. In such cases, the interests of justice will be served by providing a forum where qualified interested parties can be heard. Thus, a court addressing standing under the alternative test does not need to determine which party seeking to intervene is the *most* appropriate party in comparison to any other potential party, but rather needs to determine only which parties are, in fact, appropriate parties to a full and fair litigation of the dispute in question.

¶ 37 Recognizing that more than one party may be appropriate in a given case is consistent with the reason we provide an alternative path to standing—to ensure that relevant issues are raised by a party who can effectively address them. Limiting the ability to claim alternative criteria standing to one party in any given case will inevitably mean that some issues will not be addressed because each party competing for the coveted "most appropriate" status will raise its own distinct issues. Likewise, even where competing parties raise similar issues, no two parties will present them identically.

¶ 38 Allowing multiple parties to establish standing under the appropriate party test should not necessarily result in the intervention of every party asserting any interest. Parties hoping to intervene must still show "a real and personal interest in the dispute." 675 P.2d at 1150. Moreover, where multiple intervenors raise identical or similar issues, the judge or administrative board has the discretion to require the parties to collaborate on their briefing so as to protect the court or administrative board from being overwhelmed by duplicative filings.

¶ 39 In addition, an appropriate party must still satisfy the second part of the alternative test before we will grant standing. Once a party has established that it is an appropriate party to the litigation, it must also demonstrate that the issues it seeks to raise "are of sufficient public importance in and of themselves" to warrant granting the party standing. *Id.* This requires the court to determine not only that the issues are of a sufficient weight but also that they are not more appropriately addressed by another branch of government pursuant to the political process. *Id.* The more generalized the issues, the more likely they ought to be resolved in the legislative or executive branches.

¶ 40 A number of post-*Jenkins* cases have interpreted *Jenkins* as treating issues of sufficient public importance as a third and separate test for standing. *See, e.g., Nat'l Parks & Conservation Ass'n v. Bd. of State Lands,* 869 P.2d 909, 913 (Utah 1993) (holding that plaintiff National Parks had standing because it raised issues of significant public importance); *Sierra Club v. Utah Solid & Hazardous Waste Control Bd.,* 964 P.2d 335, 339–40 (Utah Ct.App.1998) (recognizing three separate standing tests and holding that the Sierra Club had standing because it raised "issues of great public importance"); *Sierra Club v. Dep't of Envtl. Quality,* 857 P.2d 982, 986–88 (Utah Ct.App.1993) (listing the traditional criteria, most appropriate plaintiff, and issues of public importance as three distinct paths to standing and denying standing on all three grounds). However, *Jenkins* did not treat issues of public importance as a separate test. Rather, *Jenkins* specifically stated, "The absence of a more appropriate plaintiff will not automatically justify granting standing to a particular plaintiff. This Court must still determine, on a case-by-case basis, that the issues are of sufficient weight." 675 P.2d at 1150 (citation omitted). We also stated that the court "will deny standing" to a party who cannot demonstrate that it is an appropriate party, without suggesting that a court ought to then continue to the important issues analysis. *Id.* Moreover, we held the plaintiff in *Jenkins* did not have standing, noting that "[s]ince [the plaintiff's] claim for standing . . . is predicated solely on the grounds of its public importance, we will not grant him standing when the pleadings reveal other potential plaintiffs with a more direct interest in this particular question." *Id.* at 1151. *Jenkins* thus contemplated that the important issues analysis was to serve as the second step of an alternative standing test and not as its own separate test, a conclusion we now endorse anew.

¶ 41 In summary, a party who satisfies the traditional test has standing and the court need not inquire further. *Id.* at 1150. How-

ever, when a party fails the traditional test, the court must then determine whether a party has standing under the alternative test. To make this determination, the court must first ask whether the party is an appropriate party. *Id.* If the party is not an appropriate party, the court's inquiry ends and standing is denied. *Id.* On the other hand, if the party is an appropriate party, the court then considers whether the party is asserting issues of sufficient public importance to balance the absence of the traditional standing criteria. *Id.* at 1150–51. If so, the party has standing.

¶ 42 Having clarified what a party must prove under the alternative standing test, we note that even if the Sierra Club had not met the traditional standing test, it would have standing under the alternative test. The Sierra Club is an appropriate party because it has "the interest necessary to effectively assist the court in developing and reviewing all relevant and legal factual questions." *Id.* at 1150. The Sierra Club and its members have an interest in ensuring that the construction and the operation of the plant comply with all applicable state and federal environmental laws as well as with state administrative procedures, thus preventing any needless and unlawful pollution or other environmental destruction. Furthermore, as an entity focused on protecting the environment, the Sierra Club has the interest and expertise necessary to investigate and review all relevant legal and factual questions relating to the plant.

¶ 43 We do not doubt that the Citizens' Group is also an appropriate party, for it represents a large group of Sevier County citizens who live near the proposed site. However, the fact that the Citizens' Group is an appropriate party to litigate the claims of its members does not alter the Sierra Club's status as an appropriate party. Indeed, the Sierra Club may be better equipped to effectively assist the court with the relevant legal and factual issues because it has access to

more resources and has more experience in the environmental litigation forum. Moreover, the Sierra Club's petition for standing does not merely duplicate that of the Citizens' Group. Rather, the Sierra Club presents its own distinct issues; for example, the Sierra Club asserts that the Executive Secretary did not adequately address carbon dioxide and other greenhouse gas emissions, did not sufficiently consider carbon injection for the control of mercury, did not require continuous opacity monitoring, and did not require appropriate "Best Available Control Technology" limits, as required under the Clean Air Act. Even where the Sierra Club's arguments overlap with those of the Citizens' Group, the Sierra Club presents the arguments from a different perspective, specifically focusing on the details of the Clean Air Act and the harmful effects of particular emissions. Accordingly, we believe that the Sierra Club's issues are unlikely to be raised effectively unless it is allowed to intervene.

¶ 44 As to the public importance requirement, the issues in this case are sufficiently important to warrant granting the Sierra Club standing. The plant will emit hazardous chemicals. Given the plant's proximity to homes and recreational areas, including Capitol Reef National Park, an area protected by the federal Clean Air Act,[6] the Executive Secretary must comply with all applicable state and federal laws. To ensure that this happens, it is important to give the opportunity to be heard to those persons who will be directly affected by the alleged violations of state and federal law. Moreover, the Sierra Club's allegations that the Executive Secretary failed to comply with state and federal law are not more appropriately addressed by other branches of government. Rather, the legislative and executive branches have already addressed these issues by passing the federal Clean Air Act, 42 U.S.C. §§ 7401, 7671q (2000), the Utah Air Conservation Act, Utah Code Ann. §§ 19–2–101 to 127 (2003 & Supp.2005), and the Utah Ad-

---

**6.** The Federal Clean Air Act provides that all national parks exceeding six thousand acres are class I Federal areas. 42 U.S.C. § 7472(a)(4) (2000). Congress has "declare[d] as a national goal the prevention of any future, and the remedying of any existing, impairment of visibility in mandatory class I Federal areas which impairment results from manmade air pollution." 42 U.S.C. § 7491(a)(1) (2000). Capitol Reef National Park is a class I Federal area. Utah Admin. Code r. 307–405–4(1) (2006).

ministrative Procedures Act, Utah Code Ann. §§ 63–46b–0.5 to –23 (2004 & Supp.2005). The Sierra Club is merely seeking compliance with these laws and thus is entitled to petition the Board for that relief.

## CONCLUSION

¶ 45 We hold that the Board erred by denying standing to the Sierra Club. In accordance with the Administrative Procedures Act, we also hold that the Board's decision substantially prejudiced the Sierra Club in denying it the opportunity to challenge the Executive Secretary's order or to defend its interests. We therefore reverse and remand to the Board with instructions to allow the Sierra Club to intervene in the proceedings.

¶ 46 Associate Chief Justice WILKINS, Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Chief Justice DURHAM's opinion.