*This opinion is subject to revision before final publication in the Pacific Reporter.*

**2014 UT 25**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

LIVING RIVERS,
*Petitioner and Cross-Respondent,*

*v.*

US OIL SANDS, INC.,
*Respondent and Cross-Petitioner,*

*and*

UTAH DIVISION OF WATER QUALITY,
*Respondent and Cross-Petitioner.*

No. 20121009
Filed June 24, 2014

On Petition for Review of a Decision of the Division of Water Quality

Attorneys:

Joro Walker, Charles R. Dubuc, Jr., Salt Lake City,
for petitioner and cross-respondent

A. John Davis, Christopher R. Hogle, M. Benjamin Machlis,
Salt Lake City, for respondent and cross-petitioner

Sean D. Reyes, Att'y Gen., Bridget K. Romano, Utah Solicitor
General, Paul M. McConkie, Asst. Att'y Gen., Salt Lake City,
for respondent

JUSTICE LEE authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE NEHRING,
JUSTICE DURHAM, and JUSTICE PARRISH joined.

JUSTICE LEE, opinion of the Court:

¶1 This case is before us on petition for review of an administrative determination of the Utah Board of Water Quality (BWQ). The BWQ decision before us here upheld the issuance of a discharge permit to US Oil Sands, Inc., for its tar sands bitumen-

extraction project in the Uintah Basin. The original discharge permit was granted by the Utah Division of Water Quality (DWQ) in 2008. The 2008 discharge permit was not challenged within thirty days under Utah Code section 63G-4-301(1)(a); it accordingly became final and immune from collateral attack. The 2008 decision was reaffirmed by the Executive Secretary in 2011, in response to a US Oil Sands filing identifying a number of changes to the 2008 project plan. The 2011 decision was challenged administratively by intervenor Living Rivers, an environmental advocacy organization. When the BWQ reviewed the Secretary's decision, it affirmed the issuance of the 2008 permit on its merits. That BWQ decision—the 2011 reaffirmance of the 2008 discharge permit—is the decision before us on petition for review.

¶2    We dismiss the petition as untimely. Living Rivers' arguments are addressed to the legal and factual basis for the Executive Secretary's 2008 decision granting US Oil Sands' original discharge permit. Yet there was no timely challenge to the 2008 decision, so the original permit was final and not subject to further challenge on its merits. For that reason we lack jurisdiction to consider the merits of Living Rivers' petition, and we dismiss the case on that basis.

I

¶3    US Oil Sands is pursuing a plan to build a bitumen-extraction project in the tar sands of Utah's Uintah Basin. Legally, the project requires US Oil Sands to secure various permits, including a discharge permit from the DWQ, UTAH CODE § 19-5-107, and an operating permit issued by the Division of Oil, Gas & Mining (DOGM), *id.* § 40-10-9.5(2).

¶4    The DWQ's authority is set forth in the Utah Water Quality Act. The Act makes it unlawful for any person to discharge any pollutant into the "waters of the state" without a permit from the DWQ. *Id.* § 19-5-107(1)(a). It also affords discretion for the DWQ to promulgate rules regarding the standards for those discharge permits. *Id.* § 19-5-108(1).

¶5    Pursuant to that authority, the DWQ has promulgated extensive rules prescribing the terms and conditions for issuance of a discharge permit. *See* UTAH ADMIN. CODE r. 317-6-6.4. For certain classes of applicants, the DWQ has established a streamlined permit-by-rule permitting process. That process allows certain

applicants—including those shown to have a "de minimis actual or potential effect on ground water quality"—to bypass some of the more rigorous regulatory requirements generally imposed on other applicants.[1]

¶6   US Oil Sands applied for such a permit by rule from the DWQ in 2008. As part of its application, it presented evidence regarding the ground water present at the site and gave a detailed explanation of its proposed operation and of the components of the operation that could potentially impact the ground water. The Executive Secretary of the DWQ, the first-level factfinder within the agency, evaluated all of the factual evidence presented,[2] applied the de minimis standard from rule 317-6-6.2.A(25) in conjunction with a regulatory definition of ground water,[3] and made the mixed determination that this particular facility would not have more than a de minimis impact on ground water quality and was therefore eligible for a permit by rule.

¶7   The Secretary found four pieces of evidence particularly relevant in making his determination. First, he found that the substances that would be used were "generally non-toxic" and would for the most part "be recovered and recycled in the extraction process." Second, he found that the extraction would be done in

---

[1] UTAH ADMIN. CODE r. 317-6-6.2.A (stating that "the following facilities are considered to be permitted by rule and are not required to obtain a discharge permit under R317-6-6.1 or comply with R317-6-6.3 through R317-6-6.7, R317-6-6.9 through R317-6-6.11, R317-6-6.13, R317-6-6.16, R317-6-6.17 and R317-6-6.18," and listing facilities that are eligible for a permit-by-rule, including those with a "de minimis actual or potential effect on ground water quality").

[2] The evidence before the Secretary in 2008 was a U.S. Geological Survey hydrology and climate data report; well log records from the DOGM, twenty-five exploratory holes drilled near the mine, a "water rights review" of the project area, laboratory analysis of samples taken from the site, and the Secretary's personal visit to the site.

[3] *See* UTAH ADMIN. CODE r. 317-6-1.19 (2011) (defining ground water as "subsurface water in the zone of saturation including perched ground water").

tanks, and not in impoundments or process water ponds, and that most of the water would be recovered and recycled. Third, he determined that the excess material produced would not be free draining, would have a low moisture content, and would not contain any added constituents not present naturally in the rock. And finally, the Secretary found that there was only a limited amount of shallow, localized ground water at the site that is not part of a regional aquifer system.

¶8 The Secretary, considering these factors, concluded that "the proposed mining and bitumen extraction operation should have a de minimis potential effect on ground water quality." On that basis he determined that the project "qualifie[d] for permit-by-rule status." The Secretary included a reopen provision, however, that directed US Oil Sands to alert the Secretary "[i]f any of these factors change[d] because of changes in your operation or additional knowledge of site conditions." If those changes were material enough to change the ultimate conclusion that the effect on ground water would be de minimis, US Oil Sands would no longer have permit-by-rule status. There were no challenges to the 2008 permit-by-rule decision.

¶9 In 2011, US Oil Sands informed the DWQ of four changes to its proposed plan in accordance with the reopen provision: (1) technological improvements meant that a chemical that was listed in the original application was now unnecessary and would not be used; (2) the mine would use a different kind of filter to "dewater" the excess material, but the material would still be "within the original estimated range for water content"; (3) instead of two twenty-five-acre storage areas, it would use one thirty-four-acre area and one thirty-six-acre area; and (4) waste would be disposed of in the storage areas instead of an open pit. The Secretary concluded that the changes did not affect the original permit-by-rule determination that the project would have a de minimis effect on ground water quality.

¶10 Within thirty days of that decision, Living Rivers intervened as an "aggrieved party," seeking review of the Secretary's decision by an administrative law judge pursuant to Utah Code section 63G-4-301. Living Rivers asked that US Oil Sands be stripped of its permit-by-rule designation and required to comply with the full range of regulatory requirements to obtain a dis-

charge permit. The Secretary moved to dismiss the request for review as untimely.

¶11 The ALJ recognized that Living Rivers' challenge was "not really . . . about the [2011] proposed modifications" but was instead "focused on the de minimis potential effect of the project on ground water quality due to the absence of shallow ground water, a central basis for the 2008 decision." Instead of dismissing the case, however, the ALJ determined that the 2011 modification decision implicated matters resolved in 2008, and thus reviewed those matters as they were "relevant to the 2011 modification decision." In so doing, the ALJ ultimately recommended to the BWQ that it deny Living Rivers' request and affirm both of the permit-by-rule determinations of the Secretary. Specifically, the ALJ found that there was substantial evidence to support the Secretary's finding that there was no ground water at the site, that the proposed facility did not present a greater than de minimis risk to ground water, and that the Secretary did not erroneously interpret the law. The BWQ approved the ALJ's recommended order in its entirety.

¶12 Living Rivers filed a petition for review of agency action with the Utah Court of Appeals under Utah Code sections 63G-4-403(2)(a) and 78A-4-103(2)(a)(1). The court of appeals subsequently certified the petition for consideration in this court. *See id.* § 78A-4-103(3).

II

¶13 On this petition for review, Living Rivers challenges the permit by rule issued to US Oil Sands and reaffirmed by the BWQ on several grounds. Its principal arguments are directed at challenging the regulatory definition of "ground water" applied in the issuance of the US Oil Sands discharge permit, *see* UTAH ADMIN. CODE r. 317-6-1.19 (2011), and at questioning the Secretary's finding that there was no ground water present at the site in question.

¶14 In response, the DWQ and US Oil Sands defend the issuance of the permit by rule on its merits. They also raise threshold matters questioning our jurisdiction. DWQ, for its part, has moved to dismiss the petition by a "suggestion of mootness." The DWQ motion is premised on the assertion that Living Rivers has previously litigated and lost on issues identical to those presented on this petition, in a manner precluding their relitigation here. US

Oil Sands joins in the DWQ suggestion of mootness. It also asserts a cross petition, arguing that Living Rivers' challenge to the permit is untimely. The premise of the cross petition is the notion that the substance of Living Rivers' petition is a challenge to the Secretary's 2008 permit-by-rule determination, and the assertion that the 2008 decision is not subject to review because it was never challenged (by Living Rivers or by anyone else).

¶15 The threshold question concerns our jurisdiction. The respondents style both of their affirmative arguments—the suggestion of mootness and the timeliness issue—as matters addressed to our jurisdiction. But only one of them is truly jurisdictional. The "suggestion of mootness" is ultimately directed to the merits of the case.

¶16 In insisting that Living Rivers should be barred from relitigating issues presented before us in this petition, the respondents are advocating for a decision in their favor under the doctrine of issue preclusion. They are asserting, specifically, that Living Rivers' challenges to the DWQ discharge permit were matters litigated fully and resolved finally by the DOGM in granting the request for an operating permit and affirmed by the Board of Oil, Gas & Mining (BOGM).[4]

¶17 This is not an argument addressed to our jurisdiction or implicating the doctrine of mootness. A decision giving preclusive effect to decisions in parallel proceedings involving US Oil Sands' operating permit would not render "the relief requested" by Living Rivers here "impossible" to implement or of "no legal effect."

---

[4] "Collateral estoppel, otherwise known as issue preclusion, prevents parties or their privies from relitigating facts and issues in the second suit that were fully litigated in the first suit." *Moss v. Parr Waddoups Brown Gee & Loveless*, 2012 UT 42, ¶ 23, 285 P.3d 1157 (emphasis and internal quotation marks omitted). Issue preclusion applies when four elements are satisfied: "(i) the party against whom issue preclusion is asserted was a party to or in privity with a party to the prior adjudication; (ii) the issue decided in the prior adjudication was identical to the one presented in the instant action; (iii) the issue in the first action was completely, fully, and fairly litigated; and (iv) the first suit resulted in a final judgment on the merits." *Id.* (internal quotation marks omitted).

*Utah Transit Auth. v. Local 382 of the Amalgamated Transit Union*, 2012 UT 75, ¶ 14, 289 P.3d 582 (internal quotation marks omitted). It would simply direct a merits-based determination in favor of respondents. We therefore decline to address this threshold question, at least for now, because it is a matter addressed to the merits and not to our jurisdiction.

¶18 The timeliness of the Living Rivers' petition, on the other hand, is a question of jurisdictional significance. *See Perez v. S. Jordan City*, 2013 UT 1, ¶ 10, 296 P.3d 715 ("[T]he requirement of a timely appeal is jurisdictional."). To preserve the right to challenge an agency decision, an interested party must file a request for review within thirty days. UTAH CODE § 63G-4-301(1)(a). If no such request is filed, the agency action is final and conclusive and may not be subject to collateral attack. *Id.*; *see also* UTAH ADMIN. CODE r. 317-9-2(2) (2011) ("All initial orders . . . shall become final if not contested within 30 days after the date issued. . . . Failure to timely contest an initial order or notice of violation waives any right of administrative contest, reconsideration, review or judicial appeal."); *Union Pac. R.R. Co. v. Utah State Tax Comm'n*, 2000 UT 40, ¶ 24, 999 P.2d 17 (holding that an agency order that was not challenged until 150 days after the order was entered was final and not subject to attack).

¶19 The 2008 permit by rule was approved by final agency action on March 4. No challenge was filed—by Living Rivers or by any other party—within the statutory thirty-day deadline. As a result, the 2008 permit by rule became conclusive and final—insulated from collateral attack—as of April 3.

¶20 Living Rivers seeks to avoid this problem by styling its petition herein as a challenge to the 2011 modification determination by the Executive Secretary. And because the ALJ upheld the Secretary's 2011 modification determination in a manner reaffirming the basis for the 2008 permit by rule, Living Rivers insists that its petition was timely, as it was filed within thirty days of the Secretary's decision on February 15, 2011.

¶21 We disagree. The jurisdictional question presented is a matter dictated by the substance of Living Rivers' petition for review. If the substance of the petition is a collateral attack on the 2008 permit by rule, then it matters not whether Living Rivers has formally sought to tie its challenge to the 2011 modification deci-

sion. And in fact the substance of the Living Rivers' petition is directed to the 2008 permit-by-rule determination of the Secretary. We dismiss the petition as untimely on that basis.

¶22  In granting the permit by rule in 2008, the Secretary made several determinations that are center stage in this case. First, he decided, at least implicitly, that the de minimis effects exception to the permitting process—as well as the administrative code's definition of ground water—applied to the decision before him. Second, after reviewing the evidence presented, the Secretary made factual findings as to the amount of water at the site and its connection (or lack thereof) to other ground water, regional aquifers, etc. He also made further findings of fact—as to the waste that would be discharged from U.S. Oil Sands' proposed facility, and as to its propensity to pollute waters of the state. Finally, the Secretary made the mixed determination that US Oil Sands met the standards for the de minimis exception and was eligible for a permit by rule.

¶23  In 2011, the question presented to the Secretary was a much more limited one. It was whether the proposed modifications to the project would undermine the previous determination that the facility presented only a de minimis risk to ground water. In resolving that question, the Secretary concluded that the modifications did not affect the 2008 determination of a de minimis effect. And in so doing the Secretary accepted the validity of the legal, factual, and mixed determinations that he made in 2008. Without reconsidering those determinations, the Secretary simply decided that they were not affected by any of the modifications proposed in 2011.

¶24  Living Rivers' petition is addressed to the initial 2008 permitting decision and not to the limited questions resolved in 2011. Throughout its briefs and in oral argument before our court, Living Rivers seeks to challenge the administrative definition of "ground water" and the existence of a "de minimis" exception to the permitting requirements. It also seeks to challenge the factual determination of a lack of ground water at the US Oil Sands site. But again, the decision to apply these administrative standards was made at the time of the initial permitting decision in 2008, as was the finding regarding ground water.

¶25 The decision in 2011—the matter properly before us in this case—was different. It concerned only the question whether proposed modifications to the US Oil Sands facility were significant enough to alter the determinations leading to the permit-by-rule decision in 2008. Living Rivers would be entitled to revisit those questions on this petition for review. But it has failed to do so. Because it has instead addressed only issues presented and resolved in 2008, in a decision that was unchallenged and thus immune from collateral attack, we deem its current petition untimely. And we accordingly vacate the portions of the administrative decisions below that are addressed to broader questions that were conclusively resolved in 2008, as those questions were not properly presented to the ALJ or BWQ and accordingly should not have been decided.

¶26 In so holding, we underscore the significance of time limits on administrative petitions for review. Such time limits are not just arbitrary cutoffs. They are important markers, establishing the point at which a party to an administrative proceeding may move forward in reliance on the finality of an agency decision. This case is a prime illustration of this point. When US Oil Sands' discharge permit became final in 2008, it was entitled to move forward with its development plans in reliance on the conclusive finality of the Secretary's decision and on the law's bar on collateral attacks. Living Rivers' petition would reopen and upset that reliance interest. Our law forecloses that move and renders this petition untimely.

¶27 For these reasons we dismiss the petition and vacate the administrative decisions below addressing Living Rivers' arguments challenging the 2008 permit-by-rule decision. And on that basis we decline to reach either the issue preclusion argument pressed by the DWQ or the substantive issues raised by Living Rivers.

————————