*This opinion is subject to revision before final publication in the Pacific Reporter*

**2017 UT 64**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

LIVING RIVERS,
*Petitioner,*

*v.*

EXECUTIVE DIRECTOR OF THE UTAH DEPARTMENT OF
ENVIRONMENTAL QUALITY and the DIRECTOR OF THE
UTAH DIVISION OF WATER QUALITY, in their official capacity,
the UTAH DEPARTMENT OF ENVIRONMENTAL QUALITY,
the UTAH DIVISION OF WATER QUALITY,
and U.S. OIL SANDS INC.,
*Respondents.*

No. 20160503
Filed September 20, 2017

On Appeal from Final Action of Administrative Agency

Attorneys:

Joro Walker, Charles R. Dubuc, Jr., Salt Lake City, for petitioner

Sean D. Reyes, Att'y Gen., Stanford E. Purser, Deputy Solic. Gen.,
Craig W. Anderson, Paul McConkie, Asst. Att'ys Gen.,
Salt Lake City, for respondents Utah Department of
Environmental Quality and Utah Division of Water Quality

A. John Davis, Christopher R. Hogle, M. Benjamin Machlis,
Salt Lake City, for respondent U.S. Oil Sands Inc.

JUSTICE HIMONAS authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE DURHAM and JUDGE BRADY joined.

Having recused himself, JUSTICE PEARCE did not participate
herein; DISTRICT COURT JUDGE M. JAMES BRADY sat.

JUSTICE HIMONAS, opinion of the Court:

## INTRODUCTION

¶ 1     Living Rivers appears before this court for a second time to challenge a decision by the Utah Department of Environmental Quality (UDEQ) to issue a "permit by rule" to U.S. Oil Sands Inc. (USOS) for a bitumen-extraction project in the Uintah Basin. UDEQ first permitted this project in 2008, and Living Rivers filed its first challenge to the project in 2011. In reviewing this first challenge, we concluded that Living Rivers' 2011 petition—although framed as a challenge to UDEQ's 2011 decision to allow USOS to expand its project without seeking a discharge permit (a more onerous process than obtaining a permit by rule)—was, in substance, an untimely attack on UDEQ's 2008 permit-by-rule decision. *See Living Rivers v. U.S. Oil Sands, Inc.*, 2014 UT 25, ¶ 21, 344 P.3d 568 [*Living Rivers I*]. In particular, we concluded that Living Rivers was trying to attack the 2008 analysis that supported UDEQ's determination that USOS's project qualified for a permit by rule. According to UDEQ's analysis, because the project site was "not a part of the regional acquifer system" it therefore posed only a de minimis risk to groundwater. *Id.* ¶¶ 7, 24.

¶ 2     This time, Living Rivers has asked UDEQ to review yet another proposed modification to USOS's project. Without first assuring himself that Living Rivers had standing to request agency action, UDEQ's Executive Director dismissed Living Rivers' requests for agency action on two grounds: (1) because they were the same sort of untimely attacks on the 2008 groundwater determination that this court rejected in *Living Rivers I* and (2) because UDEQ's declining to require USOS to renew its permit by rule was not the kind of decision that Living Rivers had a statutory right to challenge.

¶ 3     On appeal, Living Rivers attacks the Executive Director's conclusion that it lacks a statutory basis for challenging UDEQ's inaction. But it does not adequately challenge the Executive Director's other basis for dismissing its requests for agency action—his conclusion that Living Rivers' requests for agency action are barred by *Living Rivers I*.

¶ 4     We first discharge our independent obligation to assure ourselves that Living Rivers had standing to file its requests for agency action. Then, despite reservations about the Executive Director's statutory analysis, we conclude that Living Rivers has

waived its challenge to UDEQ's decision by failing to argue that the Executive Director erred in concluding that *Living Rivers I* bars Living Rivers' requests for agency action.

## BACKGROUND

¶ 5 This action is the second attempt by Living Rivers to require UDEQ to scrutinize, and potentially curtail, USOS's tar sands mining and processing project in the Uintah Basin on the grounds that it is polluting the waters of the state.

¶ 6 The Utah Water Quality Act "makes it unlawful for any person to discharge any pollutant into the 'waters of the state' without a permit . . . ." *Living Rivers v. U.S. Oil Sands, Inc.*, 2014 UT 25, ¶ 4, 344 P.3d 568. UDEQ is charged with administering this Act. To do this, UDEQ has promulgated standards for the issuance of discharge permits. *See* UTAH CODE § 19–5–108(1) ("[UDEQ] may make rules . . . for and require the submission of plans, specifications, and other information to [UDEQ] in connection with the issuance of discharge permits.").

¶ 7 In 2008—before Living Rivers had any involvement in this matter—USOS applied to UDEQ for a "permit by rule" for its Uintah Basin project. *Living Rivers I*, 2014 UT 25, ¶¶ 2, 6. The permit-by-rule process is a "streamlined . . . permitting process" that "allows certain applicants—including those [who show that their project will] have a 'de minimis actual or potential effect on ground water quality'—to bypass some of the more rigorous regulatory requirements generally imposed on other applicants" for discharge permits. *Id.* ¶ 5 (quoting UTAH ADMIN. CODE r. 317-6–6.2.A). In 2008, UDEQ concluded that USOS's project posed a de minimis risk to groundwater quality and therefore qualified for permit-by-rule status. *Id.* ¶¶ 6–8. As we explained in *Living Rivers I*, UDEQ based its decision on four factual determinations:

> First, . . . that the substances that would be used were 'generally non-toxic' and would for the most part 'be recovered and recycled in the extraction process.' Second, . . . that the extraction would be done in tanks, and not in impoundments or process water ponds, and that most of the water would be recovered and recycled. Third, . . . that the excess material would not be free draining, would have a

low moisture content, and would not contain any
added constituents not present naturally in the rock.
And finally, . . . that there was only a limited
amount of shallow, localized ground water at the
site that is not part of a regional aquifer system.

*Id.* ¶ 7.

¶ 8    In 2011, USOS informed UDEQ of four changes to its
proposed project. After considering these changes, UDEQ
concluded that they "did not affect the original permit-by-rule
determination and that the project would [continue to] have a
de minimis effect on ground water quality." *Id.* ¶ 9.

¶ 9    At this point, Living Rivers mounted its first challenge to
USOS's permit by rule. Intervening as an "aggrieved party" under
Utah Code section 63G-4-301, Living Rivers asked UDEQ to
revoke USOS's permit by rule and require USOS "to comply with
the full range of regulatory requirements" necessary to obtain a
full-blown discharge permit. *Id.* ¶ 10. After a lengthy adjudicative
proceeding, UDEQ affirmed USOS's permit-by-rule status, in part
based on its conclusion that substantial evidence supported the
determination that USOS's project "did not present a greater than
de minimis risk to ground water." *Id.* ¶ 11.

¶ 10  Living Rivers appealed to this court, and we affirmed
but on different grounds. We noted that Living Rivers' challenge
to the project's permit by rule, although styled as a challenge to
UDEQ's 2011 determination, was in substance an attack on the
agency's 2008 determination that the project was isolated from
regional aquifers and therefore posed a de minimis risk of
contaminating groundwater. We reached this conclusion because
Living Rivers' challenge focused entirely on errors that UDEQ
had allegedly made during the original permit-by-rule process.
*See id.* ¶¶ 20–25. Thus, instead of addressing the merits of Living
Rivers' challenge (as the agency did), we concluded that Living
Rivers' challenge was untimely. In order to challenge the agency's
2008 groundwater analysis and determination, we held, Living
Rivers needed to have intervened within thirty days of the
agency's 2008 permit-by-rule determination. *Id.* ¶ 19. "Because
[Living Rivers] . . . addressed only issues presented and resolved
in 2008, in a decision that was unchallenged and thus immune

from collateral attack, we [therefore] deem[ed] its [2011] petition untimely." *Id.* ¶ 25.

¶ 11 This brings us to Living Rivers' current challenge to USOS's project. In November 2014, USOS notified the Utah Division of Oil Gas & Mining (DOGM)—which oversees a separate, operating permit that USOS is required to maintain—of planned modifications to its project. A couple of months later, on January 13, 2015, Living Rivers' counsel sent an email to UDEQ asking whether USOS had submitted an application for a discharge permit or to renew its permit-by-rule status. On January 15, 2015, UDEQ responded that it was "aware that US Oil Sands has submitted revisions to its mine permit for DOGM," but that UDEQ "has not required an application [for a discharge permit or renewed permit by rule] because the changes in configuration of the mine pits are within the original footprint and do not constitute a change in the operation which would change any of the permit by rule factors."

¶ 12 On February 17, 2015, after confirming that UDEQ did not intend to take any action with respect to USOS's proposed modifications, Living Rivers filed requests for agency action under Utah Code sections 19-1-301 and 19-1-301.5, and, contemporaneously, a "statement of standing" in which Living Rivers explained why it was an appropriate party to bring this agency action. In its action, Living Rivers sought "review and remand of the Director's decision not to undertake a permitting process open to the public and not to require [USOS] to obtain a Ground Water Discharge Permit . . . in response to the company's notification to the Director that it intends to significantly increase the size, scope and impact of its PR Spring mining operation."

¶ 13 Living Rivers' requests for agency action centered on three key allegations: (1) that a study of the project site undertaken by Dr. William Johnson, a professor at the University of Utah, demonstrated a "hydrologic connection between the area [of the project] and perennial springs located below the mine"; (2) that DOGM was concerned that the project might have an impact on groundwater in the area, and had asked USOS to undertake an analysis aimed at assessing the possible impacts of its project on area seeps and springs, "to begin in the spring of 2015"; and (3) that another expert, Elliott Lips, had identified various deficiencies in USOS's regulatory submissions all of

which reflected that USOS was not adequately accounting, or monitoring, for the presence of groundwater at the project site. (Living Rivers also contended that certain mine tailings deposited at the project site were toxic, but, according to its own pleadings, the significance of this turned on the presence or absence of a "hydrologic connection between the area of the mine and the springs located below the mine in Main Canyon[.]")

¶ 14  USOS and UDEQ did not challenge Living Rivers' standing to file its requests for agency action. Instead, they moved to dismiss those requests on three separate grounds.

¶ 15  First, they argued that neither section of the Utah Code under which Living Rivers filed its requests—neither section 19-1-301 nor section 19-1-301.5—authorized Living Rivers to seek review of agency *inaction*. Sections 301 and 301.5—along with their implementing regulations—together define the universe of permissible adjudicative challenges to UDEQ activity. Under Utah Code section 19-1-301.5, a party is authorized to commence a "special adjudicative proceeding" if, but only if, that party seeks to challenge a "financial assurance determination" or (of relevance to this case) a "permit order." UTAH CODE § 19-1-301.5(1)(g). A "permit order," in turn, is "an order issued by a [UDEQ] director that: (A) approves a permit; (B) renews a permit; (C) denies a permit; (D) modifies or amends a permit; or (E) revokes and reissues a permit." *Id.* § 301.5(1)(f)(i). Thus, in relevant part, a party may only invoke Utah Code section 301.5—commencing a special adjudicative proceeding—if that party files a challenge to a UDEQ order that approves, renews, denies, modifies, amends, revokes, or reissues a permit.

¶ 16  If a party wishes to challenge UDEQ activity that does *not* amount to the issuance of a permit order, that party must pursue its challenge under Utah Code section 19-1-301. Section 301 "governs [all] adjudicative proceedings that are not special adjudicative proceedings as defined in Section 19-1-301.5." *Id.* § 301(2). By its terms, section 301 appears to be a catch-all, authorizing challenges to any agency activity that section 301.5 does not cover. But section 301's implementing regulations contemplate that "[f]or the most part, proceedings under [section 301] will be enforcement proceedings and proceedings to terminate permits." UTAH ADMIN. CODE r. 305-7-301. And they anticipate that parties will file requests for agency action under

section 301 to contest "[a] Notice of Violation or an Initial Order." *Id.* r. 305-7-303(1). (The administrative regulations define a "Notice of Violation" as "a notice of violation issued by the Director that is exempt from the requirements of [the Utah Administrative Procedures Act] under [Utah Code section] 63G-4-102(2)(k)." *Id.* r. 305-7-102. An "Initial Order," for its part, is defined as "an order that is not a Permit Order, that is issued by the Director and that is the final step in the portion of a proceeding that is exempt from the requirements of [the Utah Administrative Procedures Act] as provided in [Utah Code section] 63G-4-102(2)(k)." *Id.*)

¶ 17 Despite the apparently sweeping scope of agency activity that sections 301 and 301.5 jointly authorize parties to challenge, USOS and UDEQ argued—and the Executive Director held—that Living Rivers could not challenge UDEQ's decision not to require USOS to submit a new application for a permit by rule. They argued that this decision did not fall within section 301.5's definition of a challengeable "permit order" because it did not approve, renew, deny, modify, amend, revoke, or reissue a permit. They also argued that UDEQ's decision could not be challenged under Utah Code section 301—the section of the Water Quality Act that, by its terms, "governs [all] adjudicative proceedings that are not special adjudicative proceedings as defined in Section 19-1-301.5." UTAH CODE 19-1-301(2). Largely focusing on section 301's implementing regulations rather than the statutory text, they argued, and the Executive Director concluded, that section 301 only authorized challenges to "(1) proceedings contesting a Notice of Violation; (2) proceedings contesting an Initial Order; (3) enforcement proceedings; and (4) proceedings to terminate permits"—categories that did not cover UDEQ's failure to require USOS to submit a new application for a permit by rule.

¶ 18 In addition to arguing that Living Rivers lacked statutory authorization to file its challenges, UDEQ and USOS argued that Living Rivers' requests were untimely because Living Rivers had known that UDEQ declined to take action with respect to USOS's project as early as November 2014, yet Living Rivers failed to submit its requests for agency action until February 2015—well after thirty days had elapsed.

¶ 19 Finally, UDEQ and USOS argued that Living Rivers' requests for agency action were, in substance, the same sort of attacks on UDEQ's 2008 groundwater determination that this court, in *Living Rivers I*, held to be impermissible collateral attacks.

¶ 20 After briefing and oral argument, the ALJ declined to make a recommendation on the second ground—when Living Rivers had learned about UDEQ's declining to take action with respect to USOS's project. But he recommended that the Executive Director dismiss the requests for agency action on the other two grounds advanced by USOS and UDEQ. The ALJ agreed that sections 301 and 301.5 did not authorize Living Rivers' requests for agency action because they did not allow challenges to agency inaction. The ALJ also agreed that Living Rivers' requests for agency action were, in substance, challenges to "the ground water findings which were the important fourth 'relevant factor' in the Director's 2008 [permit-by-rule] determination," and that Living Rivers was barred from bringing such a challenge under *Living Rivers I*.

¶ 21 After the ALJ transmitted his recommendations to the Executive Director, Living Rivers submitted comments to the Executive Director, which focused exclusively on the ALJ's recommendation that the Executive Director should conclude that Living Rivers' requests for agency action were not authorized under sections 301 and 301.5. The Executive Director then adopted the ALJ's recommendation in full. That is, the Executive Director adopted the ALJ's recommendation to deny Living Rivers' requests for agency action because they were not statutorily authorized—as we have already explained—and he also adopted the ALJ's recommendation that the Executive Director find Living Rivers' challenges to be barred by *Living Rivers I*. The Executive Director accordingly dismissed Living Rivers' requests for agency action.

¶ 22 Living Rivers appealed to the Utah Court of Appeals, which certified the matter to this court. Utah Code section 78A-3-102(3)(b) gives us jurisdiction.

## STANDARD OF REVIEW

¶ 23 This case presents three issues for potential resolution: (1) a standing issue, (2) an issue concerning the correct interpretation of the Environmental Quality Code, and (3) an

adequate briefing question. With respect to standing, we review whether a party has standing in an agency proceeding for correctness, granting the agency's decision no deference. *Utah Chapter of Sierra Club v. Utah Air Quality Bd.*, 2006 UT 74, ¶ 15, 148 P.3d 960.

¶ 24 With respect to the correct interpretation of the Environmental Quality Code, the Utah Administrative Procedures Act authorizes us to grant relief from an agency's erroneous interpretation or application of law if we determine "that a person seeking judicial review has been substantially prejudiced" thereby. *Utah Physicians for a Healthy Env't v. Exec. Dir. of the Utah Dep't of Envtl. Quality*, 2016 UT 49, ¶ 12, 391 P.3d 148 (citing UTAH CODE § 63G-4-403(4)(d)).

¶ 25 Finally, appellants bear the burden of adequately briefing all independent bases of the order from which they appeal. *See id.* ¶ 13; *see also Simmons Media Grp. v. Waykar, LLC*, 2014 UT App 145, ¶ 32, 335 P.3d 885 ("'This court will not reverse a ruling . . . that rests on independent alternative grounds where the appellant challenges only one of those grounds.'" (citation omitted)).

## ANALYSIS

### I. STANDING

¶ 26 Before we consider the arguments before us on appeal, we must evaluate whether Living Rivers had standing to file its requests for agency action. As we have explained, Living Rivers submitted a "statement of standing" alongside its requests for agency action. Curiously, however, the Executive Director did not make a finding about whether Living Rivers had standing to bring its administrative action. Instead, the Executive Director assumed, without deciding, that Living Rivers had standing and proceeded to analyze whether Living Rivers' requests for agency action could proceed.

¶ 27 We remind the Executive Director of the obligation to make sure that parties have standing before proceeding to the merits of their case. This is because "standing is a jurisdictional requirement," *Brown v. Div. of Water Rights of the Dep't of Nat. Res.*, 2010 UT 14, ¶ 12, 228 P.3d 747, that "triggers the court's, or the agency's, subject matter jurisdiction," *Utah Chapter of Sierra Club v. Utah Air Quality Bd.*, 2006 UT 74, ¶ 13, 148 P.3d 960 [*Sierra Club*].

Courts and administrative tribunals therefore have "an independent obligation" to ensure that the parties before them have standing. *In re Adoption of Baby E.Z.*, 2011 UT 38, ¶ 36, 266 P.3d 702. Indeed, because of its jurisdictional implications, "'[s]tanding is an issue that a court can raise sua sponte at any time.'" *Gregory v. Shurtleff*, 2013 UT 18, ¶ 11, 299 P.3d 1098 (alteration in original) (citation omitted).

¶ 28   Having independently reviewed the record, we hold that Living Rivers had standing to bring its administrative actions. Under our traditional standing test, a party has standing if (1) it has a legally cognizable interest that "has been or will be 'adversely affected by the [challenged] actions,'" *Utah Chapter of Sierra Club*, 2006 UT 74, ¶ 19 (citing *Jenkins v. Swan*, 675 P.2d 1145, 1150 (Utah 1983)), (2) there is "a causal relationship 'between the injury to the party, the [challenged] actions and the relief requested,'" *id.* (alteration in original), and (3) "the relief requested [is] 'substantially likely to redress the injury claimed,'" *id.* (citation omitted). We have held that an association may establish standing under the traditional standing test by having its members attest that an agency's action or inaction will result in judicially remediable harm to their specific livelihood, health, property, or recreational interests. *Id.* ¶¶ 22–24.

¶ 29   Here, Living Rivers submitted an affidavit prepared by John Weisheit, Living Rivers' Conservation Director. Mr. Weisheit stated that he has used and will continue to use the land where USOS's project is located—as well as neighboring lands—for a variety of aesthetic, spiritual, and recreational purposes, specifically, "to watch birds and wildlife, hike, enjoy the solitude and views, take photographs, and otherwise use and enjoy the public lands." He further stated that other Living Rivers members "also use the land in the area for hunting, hiking, spiritual, and recreation purposes." And he averred that if USOS was allowed to proceed with its project, his "uses and interests [would be] immediately and irreparably harmed" because USOS's groundwater discharges would "degrade the environment and irreparably alter [his] use and enjoyment of the area." These attestations suffice to establish that Living Rivers has traditional standing because they allege that Living Rivers' members have interests in the area surrounding the USOS project area and that those interests will be harmed by environmental degradation

caused by the expansion of USOS's mining operation unless that expansion is enjoined. This meets the traditional standing test's requirement of "a showing of injury, causation, and redressability." *City of Grantsville v. Redevelopment Agency of Tooele City*, 2010 UT 38, ¶ 14, 233 P.3d 461.

¶ 30 Discharging our independent obligation to assure ourselves of the parties' standing, we conclude that Living Rivers had standing to file its requests for agency action.

## II. WE AFFIRM THE EXECUTIVE DIRECTOR'S DISMISSAL OF LIVING RIVERS' REQUESTS FOR AGENCY ACTION BECAUSE LIVING RIVERS HAS NOT ADEQUATELY BRIEFED A CHALLENGE TO AN ALTERNATIVE GROUND FOR THE EXECUTIVE DIRECTOR'S DECISION

¶ 31 Living Rivers devoted the bulk of its opening brief to challenging the Executive Director's conclusion that Living Rivers had no statutory right to challenge UDEQ's decision to decline to review USOS's permit by rule. *See supra* ¶¶ 14–17 (explaining the statutory framework and the basis for this conclusion). It suggests that the plain language of the statutory scheme appears to authorize (1) "[s]pecial adjudicative proceeding[s]" to challenge "permit orders" and "financial assurance determination[s]," UTAH CODE § 19-1-301.5(1)(g); and (2) all challenges to UDEQ decisions that are not challengeable in "special adjudicative proceedings as defined by Section 19-1-301.5," *id.* § 301(2). But instead of applying the text of this scheme, Living Rivers suggests, the Executive Director may have overstated the importance of implementing regulations that are arguably at odds with the legislature's will—concluding that section 301 only authorizes proceedings to contest a Notice of Violation, an Initial Order, or enforcement proceedings, or to contest decisions with respect to the termination of permits. *See* UTAH ADMIN CODE r. 305-7-301 ("For the most part, proceedings under [section 301] will be enforcement proceedings and proceedings to terminate permits."); *id.* r. 305-7-303(1) (other proceedings under section 301

include proceedings to contest "[a] Notice of Violation or an Initial Order").[1]

¶ 32 We do not pass on Living Rivers' argument, however, because Living Rivers' appellate brief does not adequately challenge the Executive Director's alternative basis for dismissing Living Rivers' requests for agency action—his conclusion that they were impermissible collateral attacks on the agency's 2008 determination that USOS's project was isolated from regional aquifers and therefore posed a de minimis risk to groundwater.

¶ 33 "[T]here is not a bright-line rule determining when a brief is inadequate." *Bank of Am. v. Adamson*, 2017 UT 2, ¶ 12, 391 P.3d 196. This is because "our adequate briefing requirement is not a hard and fast default notion. Instead, it is a natural extension of an appellant's burden of persuasion." *2010-1 RADC/CADC Venture, LLC v. Dos Lagos, LLC*, 2017 UT 29, ¶ 30 n.8, —P.3d— (internal quotation marks omitted). "An appellant who fails to adequately brief an issue 'will almost certainly fail to carry its burden of persuasion on appeal.'" *Adamson*, 2017 UT 2, ¶ 12 (quoting *State v. Nielsen*, 2014 UT 10, ¶ 42, 326 P.3d 645). And it is incumbent on appellants to adequately brief *all* grounds for a court's or agency's disposition of a case. When a party appeals one basis for a lower court's or agency's disposition, but "does not challenge the court's [or agency's] separate [basis for its decision]," the "issue on appeal is considered moot [because] 'the requested judicial relief cannot affect the rights of the litigants.'" *State v. Sims*, 881 P.2d 840, 841 (Utah 1994) (citation omitted).

¶ 34 As we have explained, the ALJ assigned to this matter recommended that the Executive Director dismiss Living Rivers' requests for agency action for two independent reasons. First, as we have just discussed, he concluded that Living Rivers had no statutory authority to challenge the Executive Director's decision not to require USOS to undertake a new discharge permit or

---

[1] Another implication of the Executive Director's analysis may be that a class of potentially unlawful agency decisions—failures to take legally required action—is entirely insulated from judicial review. We would welcome clarification from the legislature on whether it did, indeed, intend to insulate illegal agency inaction from court challenge.

permit-by-rule process. Second, based on USOS's and UDEQ's argument that the gravamen of Living Rivers' requests for agency action was a new study purporting to show that the 2008 groundwater determination was wrong, he concluded that Living Rivers' requests for agency action were the same kind of impermissible collateral attack on the agency's 2008 groundwater determination that we had addressed in *Living Rivers I*. This is the ALJ's reasoning:

> As directed by the Supreme Court [in *Living Rivers I*], "if the substance of the petition is a collateral attack on the 2008 permit by rule, then it matters not whether Living Rivers has formally sought to tie its challenge to the 2011 modification decision." The [*Living Rivers I*] Court found that the petition for review was indeed directed to the Director's 2008 [permit-by-rule] determination, and dismissed the petition as untimely, since no challenge had been brought within thirty days of the March 4, 2008 determination as required by [the Utah Administrative Procedures Act] and administrative rules.

> It is clear from a reading of the [new requests for agency action] and their exhibits that Living Rivers is continuing to try to challenge the ground water findings which were the important fourth "relevant factor" in the Director's 2008 [permit-by-rule] determination. Living Rivers acknowledges as much, where it argues that it "centers its RAAs" on two new documents, including a hydrogeologic report and a report stating results of tests run on processed tailings from the mine site. . . . The hydrogeologic study would be used by Living Rivers to challenge the 2008 factual determination regarding ground water at the site, which would be barred as a collateral attack on the Director's 2008 decision. . . . The claims asserted and relief sought in Living Rivers' RAAs hinge on the presence or absence of ground water, and guidance from the Utah Supreme Court directs that the RAAs must be dismissed as untimely collateral attack on the

Director's 2008 [permit-by-rule] determination, barring this tribunal from exercising jurisdiction.

¶ 35 To be sure, the ALJ's recommendation is not a final order. But the Executive Director's decision is. *See Utah Physicians for a Healthy Env't v. Exec. Dir. of the Utah Dep't of Envtl. Quality*, 2016 UT 49, ¶ 2, 391 P.3d 148 ("[Utah Code] [s]ection 63G-4-403 authorizes us to review only a *final* agency action—in this case, the Executive Director's final order."). And the Executive Director, in his final order, "adopt[ed] the Administrative Law Judge's Findings of Fact and Conclusions of Law"—including, necessarily, the ALJ's conclusion that Living Rivers' requests for agency action amounted to "an untimely collateral attack on the Director's 2008 [permit-by-rule] determination." As a result, when the Executive Director adopted the ALJ's recommendation, the ALJ's conclusion that Living Rivers' requests for agency action were untimely collateral attacks—and its underlying analysis— became a part of the Executive Director's final, appealable order, which Living Rivers had a duty to challenge on appeal. *See id.* ¶ 32 ("The Director's actions were litigated before the ALJ, and now, on appeal, we are to consider the Executive Director's final order, which incorporated the findings of the ALJ.").

¶ 36 The question, then, is whether Living Rivers adequately challenged this basis in its briefing to this court. That is, the question is whether Living Rivers adequately argued that its requests for agency action were not barred by the logic of *Living Rivers I*—that they were not, in substance, collateral attacks on the agency's 2008 permit-by-rule determination, including the agency's 2008 conclusion that the project posed a de minimis risk to groundwater because it was isolated from the regional aquifer.

¶ 37 Living Rivers had at least three basic options for challenging this determination. First, Living Rivers could have argued that the Executive Director *misunderstood* our decision in *Living Rivers I* when he concluded that it barred challenges to the 2008 groundwater determination. Second, Living Rivers could have argued that the Executive Director *misapplied* our decision in *Living Rivers I* to the factual allegations before him. Third, Living Rivers could have argued that *Living Rivers I* was wrongly decided.

¶ 38 In its opening brief to this court, however, Living Rivers did not pursue any of these three options. It did not argue that

*Living Rivers I* allowed new challenges to the 2008 groundwater determination; it did not contend that its requests for agency action could prevail even if the 2008 groundwater determination remained in place; and it did not argue that *Living Rivers I* was wrongly decided and should be overruled. Indeed, Living Rivers' opening brief did not even acknowledge that the Executive Director had dismissed Living Rivers' requests for agency action on two independent grounds. Instead, the closest Living Rivers got to challenging this basis was in a part of the "Legal Background" section of its opening brief where Living Rivers argues that, under *Living Rivers I*, a petitioner may challenge a modification to a project and "the Director is required to assess the impact [any] *modification* will have on water quality." This is the operative portion of Living Rivers' opening brief:

> Now, in seeking to challenge the Director's permitting of the 2014 modification by rule, Living Rivers is not improperly concerned with issues presented and resolved in 2008. After all, under Rule 317-6-6.2.A(25), the Director may permit by rule only those "facilities and *modifications thereto* which the Director determines after a review of the application will have a *de minimis* actual or potential effect on ground water quality." Therefore, before permitting a modification by rule under A(25), the Director is required [to] assess the impact the *modification* will have on water quality. . . . Only if the *modification* will have minimal effect on water quality may the Director permit the modification by rule under A(25). . . . Plainly, the Director did not and could not undertake analysis of the 2014 modification in 2008. Therefore, by challenging the Director's evaluation of ground water quality impacts of the modified mining operations, including the newly configured footprint of the three "mine pits" and the potential effects of the revised plan to backfill the pits with processed solids . . . Living Rivers is properly focused on the A(25) permitting decision. . . .
>
> In its RAAs, Living Rivers is also appropriately "concerned" with "whether proposed modifications

to the . . . Oil Sands facility [a]re significant enough to alter determinations leading to the permit-by-rule decision in 2008." [(quoting *Living Rivers I*, 2014 UT 25, ¶ 25)] In the RAAs and before the Executive Director, the organization has detailed the "significant" alterations Oil Sands plans to make to its mining operations and has provided ample evidence that [the] proposed modifications . . . are sufficiently significant to warrant a reexamination of the 2008 permit-by-rule decision. In addition, as Living Rivers alleges, the 2014 changes "are material enough to change the ultimate conclusion that the effect on ground water would be *de minimis*" such that "[USOS] would no longer have permit-by-rule status." . . . Thus, as the Supreme Court confirms, because Oil Sands has again proposed to alter its facility, Living Rivers is entitled to challenge the Director's decision that those modifications are "not significant enough to alter the determinations leading to the permit-by-rule decision in 2008."

¶ 39   Neither paragraph amounts to a challenge to the ALJ's (and, hence, the Executive Director's) determination that Living Rivers is unlawfully seeking to attack the 2008 groundwater determination. The first paragraph correctly points out that *Living Rivers I* did not purport to bar all challenges to proposed modifications to projects that have previously been upheld or inoculated from attack by the rules governing finality of agency decision-making, and that, consistent with *Living Rivers I*, a party could argue that modifications to a project would, themselves, change the factors that had previously justified the project's permit-by-rule status. But the Executive Director did not base his determination that Living Rivers' requests for agency action were impermissible collateral attacks on the conclusion that *Living Rivers I* was a categorical bar to any future attack on USOS's project, including attacks predicated on modifications to that project. Instead, the Executive Director concluded that Living Rivers' requests for agency action were *in substance* a renewed attack on the 2008 groundwater determination. As the ALJ put it in the recommendations that the Executive Director adopted, "[i]t is clear from a reading of the [new requests for agency action] and their exhibits that Living Rivers is continuing to try to challenge

the ground water findings which were the important fourth 'relevant factor' in the Director's 2008 [permit-by-rule] determination." *This* is the conclusion that Living Rivers was obliged to challenge on appeal. But the first paragraph does not challenge this conclusion. While Living Rivers states that its requests for agency action are allowed by *Living Rivers I* because they are *formally* targeted at modifications to USOS's project, it does not point to anything in those requests for agency action that rebut the ALJ's determination that the *substance* of Living Rivers' challenge is aimed at the 2008 groundwater determination. This is not enough.

¶ 40 There is a sense in which the second quoted paragraph of Living Rivers' opening brief is a "challenge" to the Executive Director's decision: it states that Living Rivers "has provided ample evidence that [the] proposed modifications . . . are sufficiently significant to warrant a reexamination of the 2008 permit-by-rule decision." Plainly, if it is true that the proposed modifications "are sufficiently significant to warrant a reexamination of the 2008 permit-by-rule decision," then Living Rivers' requests for agency action are not impermissible collateral attacks on the 2008 groundwater determination—they are, instead, "warrant[ed]."

¶ 41 The problem is that this paragraph utterly fails to engage with the substance of the Executive Director's ruling. The Executive Director concluded that Living Rivers was trying to innovatively characterize its way out of a timeliness problem—the same way it did in *Living Rivers I*. To be sure, Living Rivers' requests for agency action were *formally* aimed at the modifications that USOS had proposed (just as in *Living Rivers I*). But the Executive Director understood Living Rivers' requests for agency action to be elliptically stating a different claim: the claim that because new evidence indicates that the 2008 groundwater determination was incorrect—because the project site is actually connected to the regional aquifers—the modifications that USOS has proposed will have a nontrivial impact on groundwater. Thus, quoting our opinion in *Living Rivers I*, the Executive Director concluded that although Living Rivers had "formally sought to tie its challenge to the [proposed] modification," it was, in actuality, seeking to challenge the 2008 groundwater determination.

¶ 42 Now, on appeal, Living Rivers argues only that its requests for agency action should be allowed to proceed because they have "detailed the 'significant' alterations [USOS] plans to make to its mining operations," and because their claim is that those modifications are "sufficiently significant to warrant a reexamination of the 2008 permit-by-rule decision." But this is just to reiterate the characterization that the Executive Director rejected. This is not to challenge the Executive Director's rejection of Living Rivers' characterization of its requests for agency action. Living Rivers cannot hope to defeat the Executive Director's conclusion that its requests for agency action are formally aimed at the proposed modifications, but in substance aimed at the 2008 groundwater determination, by restating that its requests for agency action are formally aimed at the proposed modifications. This does nothing to help us understand why the Executive Director was wrong to conclude—as he did—that Living Rivers' requests for agency action were all rooted in the allegation that the 2008 groundwater determination was incorrect. Nor does it help us understand why the Executive Director was wrong to conclude that *Living Rivers I* barred such claims.

¶ 43 Put another way, the Executive Director concluded that while Living Rivers had *formally* sought to focus its requests for agency action on the new modifications proposed by USOS, those requests were *actually* aimed at the 2008 groundwater determination because they were ultimately grounded in new studies purporting to show that the 2008 groundwater determination was false. In challenging this conclusion, Living Rivers has not denied that its requests for agency action were premised on new studies purporting to show that the 2008 groundwater determination was false. Instead, it has baldly averred that the Executive Director is wrong because Living Rivers' requests for agency action are focused on the new modifications proposed by USOS. The Executive Director's conclusion was that Living Rivers had mischaracterized the substance of its requests for agency action; Living Rivers' response is to restate this purported mischaracterization. This brings us no closer than we were before we received Living Rivers' opening brief to knowing whether (1) Living Rivers could prevail in its new requests for agency action even if the 2008 groundwater determination remains in place; (2) we should hold that *Living Rivers I* authorizes new challenges to old

determinations when they are based on new evidence; or (3) *Living Rivers I* should be overruled. And this, in turn, is just another way of saying that Living Rivers has impermissibly sought to "dump the burden of argument and research" onto this court. *State v. Green*, 2004 UT 76, ¶ 13, 99 P.3d 820 (citation omitted); *see also 2010-1 RADC v. Dos Lagos*, 2017 UT 29, ¶ 30 & n.8, —P.3d—.

¶ 44 Our conclusion that Living Rivers has not adequately challenged the Executive Director's decision is reinforced by the course of events after Living Rivers filed its opening brief. In its response brief, USOS argued that we should affirm the Executive Director's decision "because Living Rivers does not challenge an independent basis for such dismissal"—namely, that "the Executive Director's determination that the substance of [Living Rivers' requests for agency action] is a challenge to the 2008 [permit-by-rule] determination and the 2008 finding of an absence of ground water that could be impacted by the project." USOS analyzed the portion of Living Rivers' opening brief that came closest to challenging this basis for dismissing Living Rivers' requests for agency action—the portion that we have just addressed ourselves. It urged us to conclude that this portion of the brief failed to show that Living Rivers' requests for agency action were "appropriately directed at the impact that [USOS's proposed] modifications . . . might have on the [project's] permit-by-rule status" as opposed to "call[s] for the rescission of the 2008 [permit-by-rule] determination."

¶ 45 In its reply brief, Living Rivers does not dispute that its opening brief failed to challenge the Executive Director's determination that the substance of Living Rivers' requests for agency action was a challenge to the 2008 groundwater determination. Instead, rather than responding to USOS's inadequate briefing argument, Living Rivers sets forth new arguments focused on the Executive Director's determination that its requests for agency action were not barred by *Living Rivers I*. Among other things, it argues that its requests for agency action do not merely attack the 2008 groundwater determination, but instead also challenge the agency's decision not to require USOS to apply for a new permit without first soliciting comments from the public on the propriety of this decision. It also suggests that USOS's proposed modification is so significant that Living Rivers

is, in effect, challenging an entirely *different* project from the project previously permitted by rule. And it states, for the first time, that the Executive Director "Wrongly Contends that Presentation of New Information Relating to Permit-by-Rule Factors Constitutes a Collateral Attack on the 2008 Permit."

¶ 46 The newness of the arguments in Living Rivers' reply brief—coupled with the fact that Living Rivers' reply brief does not respond to USOS's contention that Living Rivers failed to brief this ground in its opening brief—confirms our conclusion that Living Rivers has failed to adequately challenge the Executive Director's determination that Living Rivers' requests for agency action were impermissible collateral attacks on the 2008 groundwater determination. *See Allen v. Friel*, 2008 UT 56, ¶ 8, 194 P.3d 903 ("It is well settled that 'issues raised by an appellant in the reply brief that were not presented in the opening brief are considered waived and will not be considered by the appellate court.'" (citation omitted)).

¶ 47 Living Rivers' reply brief is a posterchild for why we do not allow parties to make new arguments in their reply briefs. The reply brief's arguments set forth a multitude of different possible resolutions to this case. For example, if we were persuaded only that Living Rivers had stated a procedural claim—the claim that the Executive Director had to solicit public comments before declining to require USOS to apply for a new discharge permit or permit by rule—then our opinion might not disturb the Executive Director's decision to the extent it barred a challenge to the 2008 groundwater determination. Instead, we might reverse and remand with instructions for the Executive Director to make the decision anew after allowing public comment. If we agreed with Living Rivers' argument that USOS's modification is, in reality, a completely different project, then we would potentially reverse and remand with instructions for the Executive Director to treat USOS as though it was an applicant for a discharge permit approaching UDEQ for the very first time. And if we disagreed that USOS's proposed modification was functionally a new project, but agreed that Living Rivers could challenge the 2008 groundwater determination based on new information, then we would potentially reverse and remand to allow Living Rivers to challenge this determination in the different context of assessing the continued viability of USOS's permit-by-rule status.

¶ 48 In short, Living Rivers' reply brief has the potential to entirely revolutionize this appeal. It implicates new arguments that, in turn, call for a wide variety of different remedies. But, because it is a *reply* brief, it does this belatedly—after USOS and UDEQ already had their one opportunity to submit appeals briefs, and after Living Rivers' opening brief has already shaped the course of the appellate briefing. This is too much, too late. It underscores that Living Rivers' opening brief failed to adequately challenge an independent ground for the Executive Director's decision.

¶ 49 We close with a candid admission: we are troubled that we have had to resolve this case on inadequate briefing grounds. Because of inadequate briefing, we are barred from wrestling with the significant questions of agency law this case presents—questions that must, for now, remain open, unsettling the administrative law process for future participants in agency decisionmaking.

¶ 50 But Living Rivers' opening brief does not point to any error in the Executive Director's conclusion that Living Rivers' requests for agency action are impermissible attacks on the 2008 groundwater determination of the sort that *Living Rivers I* bars. It has not explained in what way its requests for agency action are different from those that we held to be untimely in *Living Rivers I*. It has not explained why, if those requests are not meaningfully different from those that we held to be untimely in *Living Rivers I*, we should overrule or limit that opinion. Had Living Rivers adequately put these issues before the court, the course of argument and analysis in this case may have been very different. We would have been focused from the get-go on the import of *Living Rivers I*; we would have been focused on the specific exhibits and allegations that Living Rivers set forth in its requests for agency action that were either distinguishable (or not) from the claims at issue in *Living Rivers I*; we would have been focused on the policies underlying bars on collateral attacks on prior agency findings of fact; to the extent we agreed with some or all of Living Rivers' arguments, we would have been focused on the appropriate appellate remedy. We would have, in short, been focused on important questions of agency law.

¶ 51 But that is not how this case has gone. Living Rivers has not timely explained how the Executive Director got it wrong.

And, consistent with both appellate efficiency (which is just another way of saying, "fairness to other parties with pending appeals") and our adversarial system of justice (which says that USOS gets the opportunity to respond to Living Rivers' arguments), we will not independently root around in the record to try to figure out whether the Executive Director got it right.

## CONCLUSION

¶ 52 We affirm the Executive Director's decision on the ground that Living Rivers failed to adequately challenge his determination that its requests for agency action were untimely collateral attacks on the 2008 groundwater determination of the sort that *Living Rivers I* bars.

————————